**Ashish MATTA, a minor, By and Through his parents, Dr. Mahendra MATTA and Mrs. Sarita Matta, Plaintiffs,**

v.

**BOARD OF EDUCATION—INDIAN HILL EXEMPTED VILLAGE SCHOOLS, Defendant.**

**No. C–1–88–541.**

United States District Court, S.D. Ohio, W.D.

Feb. 28, 1990.

**254**

Michael Mooney, Cincinnati, Ohio, for plaintiffs.

Bruce Petrie, Jr., Cincinnati, Ohio, for defendant.

## ORDER

CARL B. RUBIN, Chief Judge.

This matter is before the Court on Plaintiff's Motion to Review and Reverse Administrative Decision pursuant to the Education of the Handicapped Act (EHA), 20 U.S.C. § 1400 et seq. (Doc. No. 8), Defendant's reply contra (Doc. No. 10) and Plaintiff's reply in support (Doc. No. 11). Upon agreement of the parties to waive any evidentiary hearing (Doc. Nos. 12 & 13) and allow the Court's decision to rest upon the pleadings and the evidence from the prior due process hearings, these motions shall be treated as cross-motions for summary judgment and shall, therefore, be dispositive of the case. For the reasons stated below, the Court denies Plaintiff's motion and grants Defendant's motion, and denies reimbursement to the Plaintiffs for their private placement of their son.

## OPINION

### APPLICABLE LAW

The EHA provides federal money to assist state and local agencies in educating handicapped children. As a condition for receiving federal aid, a state must have in effect a policy that assures all handicapped children the right to a "free and appropriate public education" (FAPE). 20 U.S.C. § 1412(1). A FAPE is defined under the EHA as special education and related services provided in conformity with the Individual Educational Plan (IEP) required under 20 U.S.C. § 1414(a)(5). 20 U.S.C. § 1401(a)(18). A FAPE is an education that is sufficient to confer some educational benefit upon the handicapped child. *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 3047, 73 L.Ed.2d 690 (1981). "The basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. at 3048. "While in order to be 'appropriate,' the educational benefits provided by the states must be more than *de minimis*, they need not maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children." *Doe by and through Doe v. Smith*, 879 F.2d 1340, 1341 (6th Cir.1989) (citations omitted). Such instruction and services

must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education system, and must comport with the child's IEP. *Id.* 458 U.S. at 203, 102 S.Ct. at 3049.

The IEP is a written statement for each handicapped child developed in a meeting by an educational unit representative who shall be qualified to provide or supervise specially designed instruction to meet the unique needs of handicapped children. 20 U.S.C. § 1401(a)(19). The IEP must include a statement of the child's present level of educational performance, annual goals, the services to be provided the child, the extent to which the child will be able to participate in regular educational programs, dates for initiation and duration of such services, and appropriate objective criteria, evaluation procedures, and schedules for determining on at least an annual basis whether instructional objectives are being achieved. *Id.* The state must insure that school officials will establish or revise an IEP for each handicapped child with participation by the child's parents or guardian at the beginning of the school year. 20 U.S.C. § 1414(a)(5). School officials must review, and if appropriate, revise the IEP's provisions at least annually. *Id.*

The EHA, 20 U.S.C. § 1415, establishes procedural safeguards that a state or local educational agency must provide. These include an opportunity for a handicapped child's parents or guardian to inspect relevant records and to obtain an independent educational evaluation of the child; written prior notice to the parents or guardian whenever the agency proposes to or refuses to initiate or change the identification, evaluation or educational placement of the child or the provision of a FAPE; and an opportunity to present complaints with regard to relevant matters. 20 U.S.C. § 1415(b)(1).

If a parent or guardian presents a complaint, he shall have an opportunity for an impartial "due process" hearing to be conducted by the state or local educational agency or intermediate educational unit. 20 U.S.C. § 1415(b)(2). If the hearing is conducted by the local or intermediate agency or unit, any party aggrieved by the decision may appeal to the state educational agency which shall conduct an impartial review of such hearing. 20 U.S.C. § 1415(c). A party may bring a civil action in state court or the United States District Court if aggrieved by the decision of the state educational agency. 20 U.S.C. § 1415(e)(2).

In resolving a claim under the EHA, the court shall receive the records of the administrative proceedings, hear additional evidence at the request of a party, and grant such relief as the Court deems appropriate. *Id.* The Court must undertake a *de novo* review of the due process hearing while giving due weight to the state administrative proceedings. *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir.1983), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). The Court's *de novo* review consists of a two-step inquiry: (1) has the state complied with the EHA's procedural requirements, and (2) is the IEP reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3050–51. The Court must give greater deference to the state's placement decision if the EHA's procedural requirements have been met. *Roncker*, 700 F.2d at 1062 (citing *Rowley*, 458 U.S. 176, 102 S.Ct. 3034). Once the Court determines that the EHA's requirements have been satisfied, questions of methodology are for resolution by the state. *Rowley*, 458 U.S. at 208, 102 S.Ct. at 3052.

When devising an appropriate program for individual students, cost concerns are legitimate. *Roncker*, 700 F.2d at 1063; *Clevenger v. Oak Ridge School Bd.*, 744 F.2d 514, 517 (6th Cir.1984). However, costs may be taken into consideration only when choosing among several appropriate education options. *Clevenger*, 744 F.2d at 517. When only one alternative for an appropriate education is available, the state must follow that alternative irrespective of the cost. *Id.*

Ohio law parallels the EHA in pertinent respects. It requires that handicapped chil-

dren of compulsory school age be provided an appropriate public education; that handicapped children be educated with non-handicapped children to the maximum extent appropriate; and the procedural safeguards enumerated under 20 U.S.C. § 1415 be provided. Ohio Rev.Code Ann. §§ 3323.-02, et seq.

The issue in this case concerns the remedies available to the parents of a child who feel that he has been improperly placed by local school authorities. In certain cases, parents may obtain retroactive reimbursement for tuition and related services provided to a child where parents have privately placed him in a particular school. *Burlington School Comm. v. Mass. Dept. of Ed.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). A parent does not waive his right to such reimbursement by unilaterally changing his child's placement while review proceedings are pending. *Id.* at 370, 105 S.Ct. at 2002. However, parents who unilaterally change their child's placement during the pendency of review proceedings do so at their own financial risk.[1] *Id.*

In order for Plaintiffs to establish a right to reimbursement, two requirements must be met. First, the private placement by the parents must have been proper under

the EHA. Second, the IEP calling for placement in a public school must have been inappropriate.[2] *Id.*

## FACTS

Ashish Matta is the severely multi-handicapped son of Dr. and Mrs. Mahendra Matta. His date of birth is May 16, 1979. Ashish's parents were sufficiently concerned about his developmental delays to have him evaluated in July, 1982, at the Cincinnati Center for Developmental Disorders (CCDD). (Jnt.Ex. 60). Ashish's case manager at the CCDD, Dr. Sonya Oppenheimer, later concluded that Ashish "is basically retarded with a language delay." (Jnt.Ex. 77). In addition, Dr. Barbara Voelkel, the school psychologist for the Indian Hill District, testified that Ashish is at least severely mentally retarded with some degree of autism. (TV-60-80)[3] This is important because the Mattas dispute Ashish's diagnosis as being primarily mentally retarded. Instead, they feel that Ashish is primarily autistic, although no expert confirms this opinion. The significance relates to the fact that the Mattas have been reluctant to place Ashish in programs that are primarily for the mentally retarded.

---

1. Although the Mattas placed Ashish in the Higashi school prior to instituting these proceedings, the Court finds that the reasoning in Burlington is still applicable, and therefore, there is no waiver of a right to reimbursement if the other requirements are met.

2. Plaintiffs advocate the position that Burlington only requires the Court to compare "the placement under the proposed IEP with that ultimately chosen by the parents to determine whether reimbursement is appropriate." (Doc. no. 8, p. 18). The Court disagrees. Burlington sets forth a two part test as to whether reimbursement is appropriate or not. Both parts must be met. The Court nowhere suggests that a balancing approach is appropriate.

Plaintiffs also advocate the position of the Fifth Circuit in *Alamo Heights Independent School District v. State Bd. of Educ.*, 790 F.2d 1153 (5th Cir.1986), which allows for partial reimbursement where the parents placement is less than a 100% satisfactory. Again, the Court disagrees with this position. The plain language of Burlington states that if the two part test is

met, the parents can be reimbursed. There is no remedy if the test is "partially" met.

3. Dr. Voelkel also testified that Ashish's last IQ test was when he was eight years old. "And his development was averaging about 18 months. That is at least severe retardation." Under the American Association of Mental Deficiency, Ashish's intellectual or cognitive status "has been classified as either severe or profound, and that his adaptive behavior has pretty consistently been classified as severe." (TV-66). Adaptive behavior is defined as self-help skills such as grooming, eating, and toilet training.

There are several tests that have been consistently employed in diagnosing Ashish. There is the Vineland Social Maturity Scale, now called the Vineland Test of Adaptive Behavior ("Vineland"). It tests self-help skills, independent functioning, eating, grooming, locomotion, and grooming. "It is a good assessment of how a child copes with the demands of every-day life in his environment." (TV-71). There is also the Bayley Scale which measures cognitive functioning. (TV-73). Readings from these tests led Dr. Voelkel to her conclusion.

This evaluation at the CCDD concluded that Ashish suffered from a severe language disorder, had difficulty with interactive skills, and demonstrated inconsistent eye contact, inconsistent reaching out, an inappropriate gesturing system, and other autistic-like mannerisms. (Jnt.Ex. 60). As a result of this evaluation, Ashish attended a CCDD diagnostic classroom from October through December, 1982. This was the first of several placements for Ashish prior to reaching school age.

Upon recommendation from the doctors at the CCDD, Ashish was next enrolled in the Arlitt School from January through June, 1983. During this time, Ashish was also receiving private speech therapy. In February, 1983, the Indian Hill Exempted School District ("District") drafted the first IEP for Ashish although he was still preschool age. This IEP recommended a placement for Ashish at the Bobbie Fairfax School. At the IEP meeting with school officials, the Mattas rejected this placement although it was known to them that the Arlitt School was an inappropriate placement because it was primarily a school for nonhandicapped children, and therefore, it lacked special services for Ashish.[4] In August through December, 1983, Ashish was placed in the Norwood Alternative Learning Center. The parents withdrew Ashish because they felt the afternoon nap was inappropriate.

In January, 1984, Ashish's parents accepted a second IEP which recommended placement in the Holmes Elementary Program. In April, 1984, the Mattas removed Ashish from the Holmes Program and began a home educational program modeled on the "Kaufman Program."[5] In November, 1984, Mrs. Matta became dissatisfied with Ashish's progress, and she therefore discontinued the in-house education, concluding that a more structured program would be of greater benefit to Ashish. (TII–37–39).[6] As a result, the Mattas placed Ashish back in the Holmes Program from January through June, 1985. Following this change, a third IEP was prepared by the District and approved by the Mattas. (Jnt.Ex. 3).

This IEP, like the others, met all of the procedural requirements as required by 20 U.S.C. § 1401(a)(19). In addition, the IEP set forth specific goals in four domains, the domestic, community, recreation/leisure, and vocational.

Ashish continued at the Holmes Program from September, 1985 through June, 1986. During this period, the District prepared four IEPs for Ashish. (Jnt.Exs. 4, 5, 6, and 7). By December, 1985, the Mattas became dissatisfied with Ashish's progress at the Holmes Program and sought a second multifactored evaluation from CCDD.[7] (Jnt.Ex. 19). This evaluation recommended a structured, residential placement for Ashish with 24 hour programming based on his individual needs. The evaluation stated that "[o]ne possible program would be the Resident Home for the Mentally Retarded ("Resident Home"). Parents were encouraged to investigate this as well as other residential programs." (Jnt.Ex. 19).

Despite this recommendation, the Mattas on their own accord, decided that the Resident Home was inappropriate for Ashish. (TII–75–81). Because of the policy of the Resident Home, the District could not directly refer Ashish, only the parents could. Therefore, the District offered names and phone numbers to the Mattas in order to follow through on this placement recommendation.

---

**4.** It should be noted that this is the first of several occasions when the parents of Ashish have acted against the recommendation of experts, and on their own initiative instead. In addition, at least one document states that the parents are very difficult to work with and perhaps expect too much from the programs. (Jnt.Ex. 68).

**5.** The "Kaufman Program" is a reputed in-home educational program for autistic children.

**6.** TI, TII, TIII, TIV and TV refer to transcript volumes from the Due Process hearing.

**7.** The Mattas' testimony and reports to the doctors indicate that during the school year, Ashish regressed in his toileting abilities. Specifically, Ashish would wet himself and play in his feces while at home. He also became destructive of household furniture.

On June 3, 1986, the final IEP conference occurred. (Jnt.Ex. 7). Because the District could not directly refer Ashish to the Resident Home, this IEP once again called for placement in the Holmes Program, maintaining the same goals as in previous IEPs. The District continued to give the Mattas information regarding placement in the Resident Home. (Jnt.Exs. 8 and 9). However, the Mattas rejected this IEP, instead electing to enroll Ashish at the Higashi School in Japan.

From September, 1986 through June, 1987, Ashish attended the Higashi School. In November 24, 1986, the Mattas requested reimbursement for the 1986–87 school year and commenced due process proceedings. Subsequently, Ashish was transferred to the Higashi School in Boston for the 1987–88 school year. Ashish is currently back in the Holmes Program. Although the reasons for his return are disputed by the parties, the Court finds that those reasons are irrelevant to this decision.

The due process hearing was held on October 13–16, 19, 20, 1987. The Impartial Hearing Officer (IHO) rendered an opinion on March 28, 1988 in favor of the District and denying the Mattas reimbursement for Ashish's tuition and expenses. An appeal was requested by the Mattas on March 31, 1988 and an opinion by a State Level Reviewing Officer (SLRO) was rendered on June 6, 1988. The SLRO ruled that the IEP for the 1986–87 school year was inappropriate for Ashish but she denied reimbursement to the Mattas because she concluded that the Higashi School was also inappropriate. The SLRO concluded that the Resident Home was the proper placement for Ashish. This appeal followed pursuant to 20 U.S.C. § 1415(e)(2). The parents seek reimbursement costs of $91,413 for the tuition for the 1986–87 school year at the Higashi School in Japan and for the tuition for the 1987–88 school year at the Higashi School in Boston, and related expenses.

8. The testimony cited by the Mattas does not support this conclusion.

## DISCUSSION

The Mattas have two hurdles to overcome in order to qualify for reimbursement. First, they must show that the Higashi School was an appropriate placement for Ashish, and secondly, that the proposed IEP was inappropriate. *Burlington*, 471 U.S. at 370, 105 S.Ct. at 2002. After a *de novo* review of the prior proceedings, the Court concurs with the findings of the IHO and the SLRO, and holds that the Higashi School was an inappropriate placement for Ashish, and therefore, the Mattas should be denied reimbursement.

■ The starting point for the Court's review is the District's proposed IEP for the 1986–87 school year. (Jnt.Ex. 7). Although the District recommended the Holmes Program in the IEP, the District made a concerted effort to have the Mattas investigate the Resident Home. However, because the District was unable to specifically refer Ashish to the Resident Home, the burden was placed upon the parents. The Mattas, without seeking any outside advice, concluded that the Resident Home was inappropriate for Ashish. The Court finds the Mattas' position in this case unreasonable. The CCDD evaluation that the Mattas rely so heavily upon in support of their contention that Ashish required a residential placement, recommends the Resident Home as an appropriate placement. (Jnt.Ex. 19). When an appropriate placement was presented to the Mattas, it became their duty to pursue that alternative until some hard evidence could be accumulated to show that either Ashish would not be admitted to the Resident Home or that the placement was inappropriate. Instead, the Mattas brushed aside the proposal and elected on their own, to place Ashish in the Higashi School in Japan. In defending their actions, the Mattas rely upon the testimony of Dr. Dorthyann Feldis, director, Special Education at the CCDD, to show that Ashish is primarily autistic and therefore suitable for the Higashi School. (Doc. No. 8, p. 8).[8] However, it should be noted

"I was not particularly concerned about establishing a diagnosis of autism when I saw him because that was something that occurred prior

that Dr. Feldis recommended the Resident Home as an appropriate placement for Ashish. (Jnt.Ex. 19).

 Not only was an appropriate placement available locally, but the Higashi School was not an appropriate placement as both the IHO and SLRO concluded. First, as the testimony of Dr. Paul Hardy, behavioral neurologist, New England Medical Center, indicates, the Higashi School "prefers not to work with children who have significant degrees of mental retardation...." (Hardy deposition, Vol. I, p. 19). Secondly, because of the distance, parental involvement is minimal. Third, according to Ashish's Cincinnati speech therapist, Gary Ward, the language difficulties presented by Japanese and by the accented English could hinder his communicative development. (Deposition of Gary Ward, pp. 66–75). Finally, there is the extreme cost of the Higashi School. The funding for one student in such a program could act to the detriment of many other students, both handicapped and nonhandicapped. The amount requested by the Mattas appears unreasonable considering the local alternative that was never tried. *See, Clevenger,* 744 F.2d at 517.

The Mattas contend that the Higashi School was appropriate because Ashish became more compliant. Although Ashish was more compliant and well behaved upon his return, his cognitive development had not changed. (Pltf.Ex. RR). In addition, there is no evidence to suggest that Ashish's compliant behavior was the product of the Higashi School or merely his being in a well structured residential setting.

In providing a FAPE, the placement need only give some educational benefit; it need not maximize the child's abilities. It is the Court's conclusion that the Resident Home is the most likely alternative to confer such a benefit upon Ashish, if a residential placement is required.

### CONCLUSION

Because the Mattas have failed to prove that the Higashi School was an appropriate placement for Ashish, they have failed to meet the first prong of the *Burlington* test, and therefore, the Mattas motion for reimbursement is denied.

IT IS SO ORDERED.

---

to my seeing him. That was not my purpose to establish that diagnosis, but to look at progress and development.

He did impress me as a child with a severe set of symptoms [autism and mental retardation]." Dr. Feldis, TI–66.