185 F.3d 635 (6th Cir. 1999)
 BRIAN RENNER, KIM RENNER, INDIVIDUALLY AND AS PARENTS AND NEXT FRIENDS OF MARTIN RENNER, PLAINTIFFS-APPELLANTS,
v.
BOARD OF EDUCATION OF THE PUBLIC SCHOOLS OF THE CITY OF ANN ARBOR, DEFENDANT-APPELLEE.
 No. 98-1162
 U.S. Court of Appeals, Sixth Circuit
 Argued: March 11, 1999
Decided: July 26, 1999
 
 Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor. No. 96-60284--Barbara K. Hackett, District Judge.[Copyrighted Material Omitted]
 Richard J. Landau (argued and briefed), Dykema Gossett, Ann Arbor, Michigan, for Plaintiffs-Appellants.
 Charles A. Duerr, Jr. (argued and briefed), Miller, Canfield, Paddock & Stone, Ann Arbor, Michigan, for Defendant-Appellee.
 Before: Wellford, Suhrheinrich, and Moore, Circuit Judges.
 Harry W. Wellford, Circuit Judge.
 
 
 1
 Plaintiffs, Brian and Kim Renner, suing on behalf of their son, Martin ("Marty"), challenge the grant of summary judgment by the district court in favor of the defendant, Board of Education of the Public Schools of the City of Ann Arbor ("AAPS").[1] They contend that the individualized educational plan ("IEP") adopted by AAPS to deal with the special problems of young Marty, an autistic child who was born in late 1991, was inadequate. For the following reasons, we AFFIRM the district court.
 
 I.
 A. FACTS
 
 2
 According to plaintiffs, Marty exhibited "signs of a disability" at a very early age prior to their moving to Ann Arbor in late 1993. When contacted by plaintiffs seeking assistance for Marty, the AAPS, in February 1994, determined early eligibilityand placed him in a preprimary impaired program ("PPI"). Defendant afforded speech therapy in a group format at school and visited the Renner home regularly to help develop language and interaction skills. Plaintiffs were not satisfied with these efforts, and thus, a Multidisciplinary Evaluation Team ("MET")[2] tested Marty, finding, among other things, deficits in social interaction and communication skills. Plaintiffs at first refused to accept the findings indicating autism and wanted Marty retained in the PPI program. Following a conference between the parties in May 1994, AAPS devised a PPI program which would require schooling three hours a day for four days a week. The IEP which was developed also called for weekly sessions of speech and therapy. After some months, plaintiffs claimed no observable progress in their two-year old son's situation, and they conceded Marty's autism.
 
 
 3
 In 1994, plaintiffs sought another opinion about early education; they consulted Dr. Luke Tsai, a child psychiatrist at the University of Michigan. Dr. Tsai confirmed the autism evaluation. AAPS convened another MET in early 1995 at plaintiffs' request. Before the subsequent Individualized Educational Planning Committee ("IEPC")[3] meeting to consider another IEP, plaintiffs sought out the services of Dr. Patricia Meinhold, a behavioral psychologist and assistant professor at Western Michigan University who was a dedicated follower of a methodology in treating autistic children initiated by Dr. Ivan Lovaas[4]. The emphasis in the Lovaas approach recommended by Dr. Meinhold was extensive home treatment with parental involvement.
 
 
 4
 When Marty reached three, plaintiffs began to interview potential home tutors, and, by February 1995, "they advised the District AAPS of their intent to begin a trial of home-based DTT." Plaintiffs' Brief at 6. Consistent with that interest, plaintiffs asked for a "one-on-one aide" for twelve weeks to encourage Marty to participate in PPI activities at the school. AAPS provided such an aide, but plaintiffs found her unsatisfactory. On their own, plaintiffs instituted a Lovaas-type DTT program in their home in March 1995. By the end of the school year, plaintiffs hadincreased the hours of the DTT program in their home from ten hours to about twenty-five hours a week.
 
 
 5
 In April 1995, plaintiffs met with Dr. Meinhold, who looked at videotapes of Marty's home activities and observed him with the home tutor selected by plaintiffs. Plaintiffs believed that in the home tutoring program their son was making progress and followed Dr. Meinhold's recommendation to "increase the intensity" of Marty's home-based DTT program to as much as thirty-five hours a week. During this time, spring and summer of 1995, plaintiffs' son was absent from AAPS activities and sessions at school as had been planned by them.
 
 
 6
 AAPS placed Marty in a new program in September 1995 for four hours a day, five days a week, which included some DTT direction. AAPS presented the new IEP to the Renners for approval, and Mrs. Renner signed this plan[5]. When Marty resumed schooling in accordance with the IEP, the hours of one-on-one home DTT were reduced accordingly. Dr. Meinhold observed at the end of September that Marty was making progress, but plaintiffs claim that defendant's new requirements brought about behavior deterioration in Marty. Soon thereafter, plaintiffs presented to defendant a list of their "concerns" about Marty's development, claiming, among other things, that Marty was not receiving one-on-one school DTT but rather, the school provided only a one-teacher-to-two-students basis of instruction. Defendant arranged a conference promptly, but there was disagreement as to the number of DTT hours demanded with one-on-one instruction, and an asserted lack of coordination between the school and home programs[6].
 
 
 7
 This September 1995 IEP, which was the subject of the first serious dispute between the parties, had several provisions. First, it provided for a new class for students, such as Marty, who lacked rudimentary communication skills. Second, it provided for increased classroom instruction, generally a ratio of seven students to one teacher and four aides. In addition, two days a weeks, there was to be a speech and language teacher, and once a week, a special therapist. Other child specialists, including a nurse, were also available. DTT was incorporated into part of each day. Marty's former teacher, Linda Singer, was to continue in charge of Marty under the 1995 IEP. AAPS sent Singer and another teacher to the Renner home, and Mrs. Renner visited the AAPS facility to meet with one of Marty's tutors to demonstrate the home training given Marty. AAPS agreed that the September 1995 IEP was limited to a one-month trial period with a possible revision thereafter.
 
 
 8
 Another conference on the school IEP was arranged in December 1995, but no agreement was reached. Plaintiffs thereafter requested a "due process" hearing, pursuant to the provisions of the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 et seq., and withdrew Marty from the school program. The Renners then proceeded to increase their home-based DTT program[7]. AAPS maintains that the proposed December 1995 IEP came about after its offer to reimburse plaintiffs for one and a half hours of daily home DTT. The parties disagree as to whether this offer would replace schooltime DTT. There were discussions about the frequency of submission of trial data to the plaintiffs and the frequency of homevisits by school personnel, as well as parent observation periods at school[8].
 
 
 9
 Plaintiffs also requested that defendant pay Dr. Meinhold for an independent evaluation, which was completed in March 1996 after several observations[9]. Dr. Meinhold rendered her opinion that the December IEP was inadequate and inappropriate; her suggested program mandated:
 
 
 10
 "(1) forty hours of DTT a week, divided between the home and school environments; (2) an extended school year; (3) weekly team meetings between the school, the parents and the tutors; (4) staff training and supervision by a consultant with experience in implementing DTT with young autistic children; (5) recorded trial-by-trial data on Marty's responses to DTT; and (6) appropriate opportunities for interaction with non-handicapped peers."
 
 
 11
 Plaintiffs' Brief at 9.
 
 
 12
 The record ultimately supports the magistrate Judge's finding that the "main sticking point remained the intensity of the DTT that Marty would receive" during the 1995 fall meetings between the parties. Dr. Meinhold recommended in March 1996:
 
 
 13
 "The 'Lovaas-style' package of discrete trial-based programs is the only available intervention for young children with Autism and related disorders which has been subjected to an empirical outcome study (Lovaas, 1987) with strong positive findings. This package of intensive one-on-one discrete trial programming, systematic selection of key skills, generalization of skills in structured play and home situations, etc. is well-suited to Marty's current developmental, behavioral and educational needs. A standard administration of this program requires between 30 and 40 hours per week of therapy (the current preference in the field is for 40) conducted in the child's home followed by gradual introduction of the child into a 'regular' preschool setting with the support of a behaviorally trained aide."
 
 
 14
 JA at 389.
 
 B. PROCEDURAL HISTORY
 
 15
 The due process hearing requested by the plaintiffs then went forward. The parties chose a lawyer, Lynwood Beekman, as the local hearing officer ("LHO") in connection with the Renners' appeal. Beekman's lengthy opinion, issued on June 20, 1996, was favorable to plaintiffs. The LHO found the IEP to be flawed and ordered one-on-one DTT sessions over an extended school year, together with substantial reimbursement to plaintiffs for home program costs and for costs of Dr. Meinhold, and he concluded that he could retain jurisdiction. Defendant appealed this decision under applicable state procedure[10] to the Michigan Department of Education, which appointed William Sosnowsky as the State Hearing Review Officer ("SHRO") for the appeal. Dr. Sosnowsky reversed the LHO on September 14, 1996, concluding that the defendant IEP was adequate and valid. Significantly, he found that the burden of proof belonged to the plaintiffs rather than the defendant, as the LHO had found.
 
 
 16
 Subsequent to that decision, plaintiffs sued to reverse the SHRO and to reinstate the LHO decision based upon IDEA, 20 U.S.C. §§ 1400-1485 and 1491; the Michigan Mandatory Special Education Act ("MMSEA"), MCLA § 380.1701, et seq.; § 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794; the Americans With DisabilitiesAct ("ADA"), 42 U.S.C. § 12101, et seq.; 42 U.S.C. § 1983, and the Michigan Handicappers' Civil Rights Act ("MHRA"), MCL § 37.1001, et seq. Motions for summary judgment, after responsive pleadings, were referred to the magistrate Judge for a report and recommendation, which was entered in December 1997, indicating that summary judgment should be granted to defendant. The district court adopted the report and recommendation and entered summary judgment for defendant on February 5, 1998. Plaintiffs made a timely appeal.[11]
 
 II.
 A. STANDARD OF REVIEW & BURDEN OF PROOF
 
 17
 We generally review the grant of summary judgment to defendant using a de novo standard of review, but the "[t]he fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings" in actions brought under the IDEA. Tucker By Tucker v. Calloway County Board, 136 F.3d 495, 501 (6th Cir. 1998) (quoting Board of Education of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 206 (1982)). We have described this standard of review as a "modified de novo review," id. at 502 (quoting Doe By and Through Doe v. Tullahoma City Schools, 9 F.3d 455, 458 (6th Cir. 1993)), and said that the language in IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review...." See Thomas v. Cincinnati Board of Education, 918 F.2d 618, 624 (6th Cir. 1990) (quoting Rowley, supra at 206). Furthermore, we have stated that "federal courts are generalists with no expertise in the educational needs of handicapped children, and will benefit from the factfinding of a state agency with expertise in the field." Doe v. Smith, 879 F.2d 1340, 1343 (6th Cir. 1989) (internal quotation marks and citation omitted). However, we are to still conduct an "independent re-examination of the evidence." Doe By and Through Doe v. Metropolitan Nashville Public Schools, 133 F.3d 384, 387 (6th Cir.), cert. denied sub. nom. Metropolitan Government of Nashville v. Doe By and Through Doe, 119 S.Ct. 47 (1998).
 
 
 18
 We have held, citing Rowley, that we are "to defer to the final decision of the state authorities" in reviewing the record on appeal. Thomas, 918 F.2d at 624 (6th Cir. 1990) (emphasis added). This court has discussed the effect of Rowley in some detail:
 
 
 19
 "Rowley recognized the conflict between the need for judicial oversight to guarantee compliance with the Act and the fact that courts, having less competence in matters of educational policy, should defer to the substantive decisions of educators and parents in fashioning appropriate IEP's. It resolved this conflict by requiring adherence to the procedural demands of the Act, while giving utmost deference to specific educational decisions once it is determined that they stem from the procedures outlined in the Act. In determining whether the state has complied with the Act's procedures, a court must not only "satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, but also to determine that the State has created an IEP for the child in question which conforms to the requirements of § 1401(19)." [Rowley, 458 U.S. at 206-07] n.27."Doe By and Through Doe v. Defendant I, 898 F.2d 1186, 1188-89 (6th Cir. 1990) ("Defendant I"). The court in Defendant I also emphasized that the courts, in reviewing IEP proposals, should concern themselves with "the process by which the IEP is produced, rather than the myriad of technical terms that must be included in the written document." Id. at 1190. Opportunity for participation by parents is also an important aspect. See School Committee of the Town of Burlington, Massachusetts v. Dept. of Educ. of Massachusetts, 471 U.S. 359, 361 (1985); Defendant I, 898 F.2d at 1191. Finally, it is clear that the parents have "the burden of proving by a preponderance of the evidence that the IEP was inadequate." Defendant I, supra at 1191 (citing Tatro v. State of Texas, 703 F.2d 823, 830 (5th Cir.), aff'd in part and rev'd in part sub nom. Irving Indep. School Dist. v. Tatro, 468 U.S. 883 (1984)).
 
 B. ANALYSIS
 1. IDEA Claim
 
 20
 a. Findings of LHO
 
 
 21
 First, we note the following findings by the LHO which we believe are supported by the record, upon our independent review and reevaluation of the evidence:
 
 
 22
 "1. 'Drs. Meinhold [the only independent expert presented by plaintiffs] and Mesibov [a psychology professor and an expert submitted by defendant] both quickly acknowledged that an academic debate has been going on regarding these concerns [as to problems with the 'Lovaas approach'] since publication of Lovaas's original study in 1987 and it continues to this date.' JA 265."
 
 
 23
 "2. Several of defendant's experts agreed that some 'discrete trial training was an appropriate methodology.' Id."
 
 
 24
 "3. Several defendant experts had not actually observed Marty in the course of DTT training, and some school 'team' members who devised the IEP at issue had no extensive DTT training or knowledge. See id. at 266-67."
 
 
 25
 Our analysis and review of the evidence indicates that the LHO relied heavily in his decision upon Dr. Meinhold's opinions and upon the opinions of plaintiffs[12]. Furthermore, the LHO was selective in his references to testimony of defendant's expert, Dr. Mesibov, referring to his testimony generally when perceived to be in agreement with Dr. Meinhold. Moreover, he found the AAPS MET not to have "the background, experience, and training to assess Marty's needs" properly because they, individually and collectively, lacked experience in "autism" and "discrete trial training." JA 275. The MET team members were Marty's teacher, a school psychologist, an occupational therapist, and a speech and language therapist. The LHO gave very strong emphasis to one particular approach, which he conceded was academically and professionally challenged as to its efficacy, and concentrated on this approach and its intensive application to the virtual exclusion of other approaches and opinions in his analysis and what he deemed as his "Conclusions of law." Ultimately, the LHO found what he considered to be procedural deficiencies in the formulation of the school board plan.
 
 
 26
 b. Findings of SHRO
 
 
 27
 SHRO Sosnowsky, on the other hand, in his examination of the record, found neither procedural nor substantive violations of the IDEA and determined, in reversing the decision of the LHO, that defendantsprovided an adequate and lawful plan. The SHRO concluded, after examination of the record and listing the qualifications of those involved in the IEP, that "there [was] abundant non-testimonial and extrinsic evidence in the record to justify a contrary decision" from that reached by the LHO. The SHRO found that the LHO "did violence" on the whole to the views of defendant's expert, Dr. Mesibov, as to the necessity of the "constant data collection of the specific trials" urged by plaintiffs and their expert. It was the opinion of the SHRO that the LHO mischaracterized the effect of the testimony of Marty's teacher, Linda Singer, perhaps the person most familiar with him and his problems, other than his parents.[13]
 
 
 28
 As to procedural requirements employed by the MET and the formulation of the IEP, the SHRO concluded that defendant's "MET thoroughly fulfilled the requirements" of the law and the applicable rules, pointing out that the rule dealing with the make-up of the MET required only one "special education-approved teacher or other specialist with knowledge in the area of the suspected disability." The SHRO also found that an adjustment in hours of DTT services for Marty did not constitute a program or plan revision, nor a change in placement requiring a new evaluation. The SHRO concluded that technical violations of IDEA, if any, did not render the applicable IEP inappropriate, particularly in light of the full participation by plaintiffs in its development.
 
 
 29
 c. Findings of Magistrate Judge
 
 
 30
 We find the magistrate Judge's recommendation and report generally not to be erroneous in any material respect. The magistrate Judge made the following basic finding:
 
 
 31
 "The Team, well familiar with Lovaas-style DTT, and what the parents were doing and Dr. Meinhold was proposing, chose to incorporate only part of that program. They were sufficiently familiar with Marty's condition, aware of the options, and did not need to have any additional experts in either autism or DTT to validate their status."
 
 
 32
 JA 1879. The availability of child psychiatrist Dr. Tsai's report on Marty to the MET, the magistrate Judge noted, was also an adequate resource for its work.
 
 
 33
 The magistrate Judge's Conclusion concerning Marty's "unique needs" bears repetition: "[t]here is nothing in the record to indicate that there was anything 'unique about Marty's autism,'" and we find no error in his Conclusion that his particular needs were addressed in the IEP. JA 1881 n.5. The magistrate Judge's Conclusion found that the IEP was sufficiently specific. See Chuhran v. Walled Lake Consol. Schools, 839 F.Supp. 465 (E.D. Mich. 1993), aff'd, 1995 WL 138882, 51 F.3d 271 (6th Cir. 1995) (unpublished per curiam). With respect to "special needs," it appeared to the magistrate Judge that Dr. Meinhold's recommendation of 40 hours of one-on-one DTT per week was her usual and customary program for all young autistic children with general needs commensurate with this problem, and not geared to Marty specifically.
 
 
 34
 The magistrate Judge was persuaded that the IEP did provide for an appropriate educational opportunity taking into account Marty's unique and particular needs. We believe that the magistrate Judge gave appropriate deference to the opinion of the SHRO, who was required under IDEA to "make an independent decision upon completion of [his] review" of the local hearing and the LHO decision. 20 U.S.C. § 1415(c).
 
 
 35
 d. The District Court's Decision
 
 
 36
 The district court, after conducting a de novo review, adopted the report and recommendation of the magistrate Judge. Thus, the magistrate Judge and the district Judge reviewed the record and reached the same Conclusion: that the LHO had reached an improper decision with undue emphasis on Dr. Meinhold's opinion.
 
 
 37
 e. Conclusions of This Court
 
 
 38
 Section 1400(c) of the IDEA was intended to ensure that a child with a disability has "a free appropriate public education... designed to meet [the] unique needs" of that child.
 
 
 39
 The statute may not require public schools to maximize the potential of disabled students commensurate with the opportunities provided to other children, see Rowley, 458 U.S., at 200; and the potential financial burdens imposed on participating States may be relevant to arriving at a sensible construction of the IDEA, see [Irving Independent School Dist. v. Tatro, 468 U.S. 883, 892 (1984)].
 
 
 40
 Cedar Rapids Community School Dist. v. Garret F. ex rel. Charlene F., 119 S.Ct. 992, 999 (1999)[14]. The differing programs or plans offered by the defendant and the plaintiffs are well-summarized by the magistrate Judge, who gave detailed consideration to the contentions of the parties and the record in this case. He summarized the issue as follows:
 
 
 41
 "[A] court's inquiry in suits brought under § 141(e)(2) [of IDEA] is twofold. First, has the State complied with the procedures set forth in the Act. And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits. [Rowley,] 458 U.S. 176, 206-207 (1982)."
 
 
 42
 JA 1872. Ultimately, we are compelled to answer in the affirmative on both accounts.
 
 
 43
 We begin our analysis by examining the findings of the LHO. We are of the view, contrary to that of the LHO, that the defendant team, taken as a whole, did have adequate "background, experience, and training" to assess this particular disabled child's condition and to formulate a program to meet his needs under both the federal and state statutes involved. We conclude that the AAPS MET, aided by expert testimony in the case, constituted a group which could make appropriate placement decisions, including an IEP, and included "persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.533(a)(3). Unlike the LHO, we cannot find from the record that the failure of the team to consult with plaintiffs' expert, Dr. Meinhold, constituted a serious deficiency in the IEP. Likewise, the failure of the team to prescribe the number of hours of DTT recommended by Dr. Meinhold was not deficient. After a thorough review of the record, we also find ourselves in disagreement with the LHO's Conclusion that the proposed IEP was not "tailored to meet Marty's 'unique' needs." Dr. Mesibov, in our view, had lengthy experience in studying autism and had legitimate concerns about the effectiveness of the Lovaas methods.
 
 
 44
 As to the SHRO's findings, we first note that we find no error in the action by the SHRO declining to recuse himself in this matter upon the request of the plaintiffs. Furthermore, we agree with the SHRO that the record demonstrates the MET's "substantial qualifications," although we doubt "Singer's qualifications exceed those of Dr. Meinhold."[15] Moreover,we agree with the SHRO that during the formulation period of the IEPs in this case, there was no fundamental change in a basic element of the education program nor a significant change in program or services initiated by AAPS to Marty within the meaning of Sherri A.D. v. Kirby, 975 F.2d 193, 206 (5th Cir. 1992), and Doe By Gonzales v. Maher, 793 F.2d 1470, 1487 (9th Cir. 1986), modified on other grounds sub nom. Honig v. Doe, 484 U.S. 305 (1988). Ultimately, we agree with the SHRO's determination that "there is abundant non-testimonial and extrinsic evidence in the record to justify a contrary decision" to the LHO. Thus, we find the SHRO's decision, based on the record, to be a correct one.
 
 
 45
 Having discussed to some extent both the LHO decision and the SHRO decision, it is evident that we have concluded that in many respects the former is flawed. As mentioned, a particular mistake of the LHO was to disregard the IEP as invalid, because the LHO erroneously found the MET not to meet statutory and procedural standards. In that respect, we agree with the SHRO and give his opinion due deference.
 
 
 46
 We hold that the defendants did provide a "free, appropriate, public education for Marty within the meaning of the statute," to use the words of the magistrate Judge. We conclude that under the applicable case law and federal standards that the magistrate Judge and the district court were not in error in their treatment of this record and in the analysis of the controversy.
 
 2. MMSEA Claim
 
 47
 We consider next the challenge under the applicable Michigan statute. Michigan has chosen to enhance IDEA's requirements, heretofore discussed, by requiring that an IEP be "designed to develop the maximum potential" of the handicapped child. MCLA §§ 380.1701(a), 380.1711(1)(a) and 380.1751(1). "The term 'maximum potential' has not been well defined in Michigan law. Further, the standard may be more precatory than mandatory; it does not necessarily require the best education possible." Brimmer v. Traverse City Area Public Schools, 872 F.Supp. 447, 454 (W.D. Mich. 1994). Michigan standards, moreover, do not require "a model education, adopting the most sophisticated pedagogical methods without fiscal or geographic constraints...." Barwacz v. Mich. Dept. of Educ., 674 F.Supp. 1296, 1302 (W.D. Mich. 1987). Plaintiffs concede as much, and that the interpretation of the standard is left in the reasonable discretion of the state officials dependent upon the circumstances of the case. See Brimmer, supra, at 454-55. We have already concluded that the procedural requirements of both the federal and state acts were met by AAPS with regard to the MET and the formulation of the IEP. Plaintiffs are not entitled to prescribe or require a specific desired methodology under these circumstances. See Rowley, 458 U.S. at 208; Lachman v. Illinois State Board of Education, 852 F.2d 290, 297 (7th Cir. 1988); Roland M. v. Concord School Committee, 910 F.2d 983, 993 (1st Cir. 1990); Tucker, 136 F.3d at 505; Barnett by Barnett v. Fairfax County School Bd., 927 F.2d 146, 152 (4th Cir. 1991).
 
 
 48
 Plaintiffs argue that the opinions of defendant's experts should be given little weight because they were not as familiar with Marty, with autism, or with DTT as was Dr. Meinhold. We disagree with this rationale. Each expert was sufficiently familiar with the unique facts and circumstances of this controversy to offer an opinion which was evaluated administratively and by the magistrate Judge and district Judge. The fact that the SHRO did not give unqualified approval to Dr. Meinhold's opinion, given her preDispositiontoward Lovaas' approach as the only acceptable methodology to treat autism of this type, does not render the SHRO's decision erroneous nor the LHO's Conclusion correct.
 
 
 49
 We find no error in the magistrate Judge's decision that "there is simply no consensus within the educational or medical communities on the most effective way to treat autism in preprimary age children." As to whether the IEP "was designed to develop the maximum potential" of Marty, we are persuaded, as were the SHRO, the magistrate Judge, and the district Judge, all located in Michigan, that the IEP met this criteria. A Michigan court has stated in this regard, dealing with the Michigan standard:
 
 
 50
 "[The Michigan statute] does not define the phrase "maximum potential." We believe that there is some limitation on what kind of program is required. When two competing educational programs which meet the child's requirements are evaluated, the needs of the handicapped child should be balanced with the needs of the state to allocate scarce funds among as many handicapped children as possible...[A]ssuming in this case that funds are available for two proposed educational programs, each suitable to enable the child to reach her maximum potential, it would appear reasonable to adopt the program requiring lesser expenditure."
 
 
 51
 Nelson v. Southfield Public Schools, 148 Mich. App. 389, 384 N.W.2d 423 (1986).
 
 
 52
 Under the higher Michigan standards, then, defendants proposed an adequate and sufficient plan to provide Marty a free appropriate public education offering to meet and develop the "maximum potential" of this child in light of his abilities and needs[16]. There was attention given to "mainstreaming" and to developing communication and relational skills with regard to other children and peers. Finally, we conclude that defendant met Michigan standards.
 
 
 53
 We have reexamined the record, the briefs, the two administrative hearings, the magistrate Judge's extensive report and recommendation, and the district court's order accepting the said report and recommendation that summary judgment be granted to defendant. We observe that in this case there was more than adequate consideration given to the requirements of the federal and state law standards as to the IEP formulation, as in Brimmer. Accordingly, under both federal and state law claims, we have made an independent review of the record under a modified de novo approach, we have given due deference to the state officer's decision and consideration to the decisions of the magistrate Judge and the district court, and we AFFIRM the decision of the latter court for defendant.
 
 
 
 NOTES:
 
 
 [1]
 The reader will hopefully forgive the use of initials for shortening descriptions in this opinion.
 
 
 [2]
 The Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1485 and 1491, requires that knowledgeable personnel evaluate a child suspected of having a disability and determine whether there is a disability as defined by IDEA, and if so, the educational needs of the child. See 20 U.S.C. § 1414. This group of knowledgeable personnel is known in Michigan as the Multidisciplinary Evaluation Team ("MET"). See Rules Relating to Education R 340.1701a(e).
 
 
 [3]
 In Michigan, final eligibility and programmatic decisions are made by a team of qualified professionals and the parents of the child called the IEPC. See Rules Relating to Education R 340.1701a(b).
 
 
 [4]
 Plaintiffs describe Dr. Lovaas as authoring "the only controlled evaluations of the effectiveness of a comprehensive behavioral program using intensive discrete trial training [DTT]." The magistrate Judge in this case gave a good description of DTT in his findings:
 Discreet [sic] Trial Training (DTT) is a form of behavioral modification, based upon a correlation of very intensive, repetitive, requests or stimuli, followed rapidly and consistently with reinforcement with desirable consequences (candy, strawberries, juice, a tickle - for appropriate responses), or with negative consequences (for improper responses), or with loud redirection (if the child's attention wanders or he resorts to self-stimulatory behavior). (Dr. Mesibov, TR 874-875). It emphasizes early intervention, heavy parental involvement, and treatment in the home or elsewhere in the community, rather than in professional (school or clinical) settings. Each trial consists of giving the child a discreet instruction (such as "stand up," "look at me," "touch nose," "what is your name," "what is this," "what is the boy doing," "say Daddy," identifying colors, shapes, big vs. small, etc.), waiting for a response, and then providing an appropriate (positive or negative) consequence. A single trial can last as little as 30 seconds if the child responds properly, but much longer if the trainer has to wait for the correct response.
 JA 1862 n. 2.
 
 
 [5]
 Mrs. Renner contends that she was warned that Marty could not attend the planned classes unless she signed the plan, and that she understood that "the program would be on a one month trial basis."
 
 
 [6]
 Plaintiffs also contended that there was a lack of professional supervision of the AAPS teacher.
 
 
 [7]
 At the time of the due process hearing, Marty received at least thirty-five hours a week of home DTT.
 
 
 [8]
 The Renners insisted on intensive participation in planning and programming throughout.
 
 
 [9]
 The defendant did not agree on Dr. Meinhold as an independent evaluator because it deemed her "more of an advocate."
 
 
 [10]
 In Michigan, there is a two-tier review system, in which decisions of Local Hearing Officers may be appealed to the Michigan Department of Education. See Rules Relating to Education R 340.1725.
 
 
 [11]
 The basis for appeal was asserted error in application of the IDEA and the MMSEA. 20 U.S.C. § 1400, et seq., and MCLA § 380.171, et seq. We therefore consider only these statutory claims.
 
 
 [12]
 Because the LHO was not satisfied with the AAPS team nor its IEP, he candidly conceded that he must "rely primarily upon the assessment conducted by Dr. Meinhold," and he admitted that she was "a strong proponent of Lovaas-style programming." JA 279-80. He concluded that there was "little, if any, basis to reject or modify Dr. Meinhold's recommendations."JA 280.
 
 
 [13]
 For example, Singer found the alleged gains of Marty due to home DTT sessions not to be "comparable," and not better than gains being made by him in the classroom. Singer testified that she was not asked by plaintiffs about continuing or increasing DTT sessions at home in excess of 12 hours a week, but she felt "there were some inherent problems with 40 hours."
 
 
 [14]
 Cedar Rapids is not directly applicable to this Michigan standard case. We discuss "maximum potential" hereinafter, but we attempt to review using a "sensible construction of the IDEA."
 
 
 [15]
 The SHRO noted that neither Singer nor Meinhold was "trained in Lovaas methodology," and that the latter had not actually observed Marty in classroom activity. JA 1797-98. Further, the SHRO found that the LHO "exceeded his authority in nullifying the qualifications of the members of the MET." JA 1799.
 
 
 [16]
 Doe By and Through Doe v. Board of Education of Tullahoma City Schools, 9 F.3d 455 (6th Cir. 1993) dealt with a statute facially similar to Michigan's. It was interpreted for other reasons not to impose a higher standard. Id. at 458.