**Maureen DEAL and Phillip Deal, on behalf of Zachary DEAL, an infant child with a disability, Plaintiffs,**

v.

**HAMILTON COUNTY DEPARTMENT OF EDUCATION, Defendant.**

No. 1:01–CV–295.

United States District Court, E.D. Tennessee, Southern Division.

March 4, 2003.

Theodore R. Kern, Knoxville, Gary Mayerson, New York, NY, for Plaintiff or Petitioner.

Charles L. Weatherly, Kathleen A. Sullivan, Thomas W. Dickson, Weatherly Law Firm, Atlanta, GA, for Defendant or Respondent.

### MEMORANDUM OPINION

EDGAR, Chief Judge.

Plaintiffs Maureen and Phillip Deal are the parents of Zachary Deal ("Zachary"), a child diagnosed with autism spectrum disorder.[1] Zachary and his parents reside in Hamilton County, Tennessee, and Zachary attended public school in the Hamilton County school system. Maureen and Phillip Deal (the "Deals") bring this action on behalf of Zachary under the Individuals With Disabilities Act ("IDEA"), 20 U.S.C. §§ 1400—1420. The case comes before this Court on appeal from a decision by an Administrative Law Judge ("ALJ") pursuant to 20 U.S.C. § 1415 § (i)(2). The ALJ ordered defendant Hamilton County Department of Eduction ("HCDE") to reimburse the Deals for expenses they incurred after May 11, 1998, in private treatment for Zachary outside of the public school system. The ALJ declined to order the HCDE to reimburse the Deals for certain other expenses. Plaintiffs and HCDE seek judicial review of the decision rendered by the ALJ on August 20, 2001.

### I.

### *Statutory Framework*

The purpose of the IDEA is to guarantee children with disabilities access to a free appropriate public education ("FAPE"). 20 U.S.C. § 1400(d)(1); *See N.L. ex rel. Mrs. C. v. Knox County Schools,* 315 F.3d 688, 689 (6th Cir.2003); *Burilovich v. Board of Educ. of Lincoln,* 208 F.3d 560, 565 (6th Cir.2000). FAPE is defined in 20 U.S.C. § 1401(8) as meaning special education and related services that (a) are provided at public expense, under public supervision and direction, without charge; (b) meet the standards of the State educational agency; (c) include an "appropriate" preschool, elementary, or secondary school education in the State involved; and (d) are provided in conformity with the individual education program required under 20 U.S.C. § 1414(d).

The statutory framework of the IDEA is summarized in *Knable ex rel. Knable v. Bexley City School Dist.,* 238 F.3d 755, 762–63 (6th Cir.), *cert. denied,* 533 U.S. 950, 121 S.Ct. 2593, 150 L.Ed.2d 752 (2001). In exchange for federal funding, the IDEA requires the State of Tennessee and HCDE to identify, locate, and evaluate all children residing in Hamilton County

---

1. Throughout this memorandum opinion this condition will be referred to as autism. The manifestations of autism vary with different children. Common behaviors are deficits in communication and social interaction. Zachary suffers from these deficits.

who are disabled and in need of special education and related services. HCDE must develop a curriculum specially tailored to the unique needs of each disabled child by means of an individualized education plan ("IEP"). *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176, 181–82, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) *Knable*, 238 F.3d at 762–63; 20 U.S.C. §§ 1401(a)(2) and 1414(a)(5). The development and implementation of the IEP are the "cornerstones" of the IDEA. *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Tennessee Dept. of Mental Health v. Paul B.*, 88 F.3d 1466, 1471 (6th Cir.1996).

The Deals object to the IEPs that HCDE devised for Zachary. The IDEA provides a review process through which parents who disagree with the appropriateness of an IEP can seek relief. The review process begins with a complaint by the parents to HCDE, followed by an impartial due process hearing before an ALJ from the Tennessee Department of Education. 20 U.S.C. § 1415(f). Any party aggrieved by the result of the administrative hearing and the ALJ's decision may bring a civil action in federal district court to obtain judicial review pursuant to 20 U.S.C. § 1415(i)(2). *Knable*, 238 F.3d at 763.

During the course of the IDEA review process, the parents and the school district are required to continue the then-current educational placement of the child as set forth in the current IEP. 20 U.S.C. § 1415(j). If the parents opt not to comply with the "stay-put" provision, they are not necessarily barred from recovering the costs of private educational placement for the disabled child. Parents, such as the Deals, who elect to remove their child from the current educational placement provided in the IEP prior to completion of the IDEA review process, and who pay for

appropriate specialized education, may seek retroactive reimbursement from the public school district. *School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Knable*, 238 F.3d at 763, 770–71.

■ However, the Deals are entitled to such retroactive reimbursement only if a federal court determines both (1) that the disabled child's placement by the school district violated the IDEA (*i.e.*, that the child was deprived of FAPE), and (2) that the private placement selected by the parents was appropriate. *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Knable*, 238 F.3d at 763, 770; *Wise v. Ohio Dept. of Educ.*, 80 F.3d 177, 184 (6th Cir.(1996). Parents who unilaterally remove their child from public school contrary to the then-current IEP, and prior to completion of the IDEA review process, do so at their own financial risk. *Florence County*, 510 U.S. at 15, 114 S.Ct. 361; *Burlington*, 471 U.S. at 373–74, 105 S.Ct. 1996; *Knable*, 238 F.3d at 763; *Wise*, 80 F.3d at 184; *Doe v. Board of Educ. of Tullahoma City Schools*, 9 F.3d 455, 460–61 (6th Cir.1993). The Deals bear the burden of proof by a preponderance of the evidence that the IEPS developed for Zachary failed to provide him with a FAPE. *Knable*, 238 F.3d at 768; *Tullahoma City Schools*, 9 F.3d at 458. If they do not meet this burden, the Deals are not entitled to reimbursement for the costs incurred by their educating Zachary privately. *Burilovich*, 208 F.3d at 572.

## II.

### *Standard of Review*

20 U.S.C. § 1415(i)(1)(2)(B) provides that the Court shall receive the records of the administrative proceeding and shall

hear additional evidence at the request of a party. *See Knable,* 238 F.3d at 763–64. On January 23–24, 2003, the Court held a hearing and received additional evidence at the request of HCDE. In accordance with § 1415 § (i)(1)(2)(B), this Court has reviewed the complete record consisting of the administrative record and the additional evidence presented at the hearing on January 23–24, 2003.

20 U.S.C. § 1415(i)(2)(B)(iii) provides that the Court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Plaintiffs bear the burden of proving by a preponderance of the evidence that the IEP devised by HCDE for Zachary was inappropriate and failed to provide Zachary with FAPE. *Knable,* 238 F.3d at 768; *Dong v. Board of Educ. of Rochester Community Schools,* 197 F.3d 793, 799–800 (6th Cir.1999); *Renner v. Board of Educ. of Pub. Schools of City of Ann Arbor,* 185 F.3d 635, 642 (6th Cir. 1999); *Tullahoma City Schools,* 9 F.3d at 458; *Cordrey v. Euckert,* 917 F.2d 1460, 1469 (6th Cir.1990).

■ The Court reviews both the procedural and substantive matters under a modified *de novo* standard of review. In reviewing the ALJ's decision under 20 U.S.C. § 1415(i)(2), the Court makes an independent decision based on the preponderance of the evidence contained in the complete record, while giving due weight to the ALJ's findings of fact. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034; *Knox County Schools,* 315 F.3d at 692; *Knable,* 238 at 764; *Burilovich,* 208 F.3d at 565; *Renner,* 185 F.3d at 641; *Tucker by Tucker v. Calloway County Bd. of Educ.,* 136 F.3d 495, 501–03 (6th Cir.1998); *Tullahoma City Schools,* 9 F.3d at 458. In explaining the concept of "due weight" under the IDEA, the Sixth Circuit has said that courts cannot simply adopt the ALJ's findings of fact without an independent examination of the evidence. *Knable,* 238 F.3d at 764; *Burilovich,* 208 F.3d at 565–66; *Dong,* 197 F.3d at 799; *Metropolitan Bd. of Public Educ. v. Guest,* 193 F.3d 457, 464 (6th Cir.1999); *Peck By Peck v. Lansing School Dist.,* 148 F.3d 619, 625 (6th Cir. 1998); *Doe v. Metropolitan Nashville Public Schools,* 133 F.3d 384, 387 (6th Cir. 1998).

■ In *Burilovich,* 208 F.3d at 566, the Sixth Circuit explains that the weight due varies depending on whether the Court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings. This Court reviews an IEP for procedural compliance but harmless technical deviations from the IDEA procedural safeguards do not render an IEP invalid and do not constitute a denial of FAPE. *Knable,* 238 F.3d at 764–65; *Burilovich,* 208 F.3d at 566; *Dong,* 197 F.3d at 800. Furthermore, if the Court finds that the State of Tennessee and HCDE have met the procedural requirements of the IDEA, then greater deference is afforded to their educational decisions. *Burilovich,* 208 F.3d at 566; *Dong,* 197 F.3d at 800; *Tucker,* 136 F.3d at 502; *Roncker On Behalf of Roncker v. Walter,* 700 F.2d 1058, 1062 (6th Cir.1983).

■ With regard to substantive issues, the "preponderance of the evidence" language in 20 U.S.C. § 1415(i)(2)(B)(iii) is not an invitation to the courts to substitute their own notion of sound educational policy for those of the public school authorities. *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034; *Knable,* 238 F.3d at 764; *Burilovich,* 208 F.3d at 566; *Renner,* 185 F.3d at 641; *Tucker,* 136 F.3d at 505; *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir.1990). In assuring that the requirements of the IDEA have been met, this Court must be careful to avoid imposing its view of preferable educational

methods upon HCDE and the State of Tennessee. "The primary responsibility for formulating the education to be accorded to a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034; *see also Burilovich,* 208 F.3d at 566.

Congress did not intend for the federal courts to overturn a school district's choice of appropriate educational methods for a disabled child in a 20 U.S.C. § 1415(i)(2) proceeding. Once a court determines that the procedural requirements of IDEA have been met and that the IEP developed by the school district is appropriate to provide the disabled child with FAPE, other disputes or debates over preferences in appropriate educational methodologies are to be resolved by the State and local education authorities without interference by the courts. *Rowley,* 458 U.S. at 207–08, 102 S.Ct. 3034; *Tucker,* 136 F.3d at 505; *Tullahoma City Schools,* 9 F.3d at 458; *Roncker,* 700 F.2d at 1062.

■ Because federal courts are "generalists with no expertise in the educational needs of handicapped children," they benefit from the factfinding of state agencies which are presumed to have expertise in the field. *Burilovich,* 208 F.3d at 566; *Renner,* 185 F.3d at 641; *Doe By and Through Doe v. Smith,* 879 F.2d 1340, 1343 (6th Cir.1989). The "due weight" standard militates against second guessing the educational expertise of administrative officials and the findings predicated upon their expertise. *Cleveland Heights–University Heights City School Dist. v. Boss,* 144 F.3d 391, 398–99 (6th Cir.1998). Accordingly, when reviewing an IEP, the Court keeps in mind that state and local administrative agencies are deemed to have expertise in education policy and practice.

The amount of weight due an administrative decision depends upon whether such expertise is relevant to the decision-making process. "[L]ess weight is due to an administrative agency's determination on matters for which educational expertise is not relevant, so that a federal court would be just as well suited to evaluate the situation. More weight is due an agency's determinations on matters for which educational expertise is relevant." *Burilovich,* 208 F.3d at 567.

■ Administrative findings in IDEA cases are afforded less deference than that given to agency decisions under the substantial evidence test. *Id.* In view of the preponderance of the evidence standard applicable to IDEA, the Sixth Circuit holds that "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Id.; see also Knox County Schools,* 315 F.3d at 692. In sum, this Court should defer to the ALJ's findings of fact below only when educational expertise is relevant to those findings and the ALJ's decision is reasonable based on the complete record. *See Burilovich,* 208 F.3d at 567.

### III.

#### *Factual History*

In 1997 when Zachary was three years old, HCDE held an Individualized Education Plan ("IEP") meeting and, together with the Deals, prepared an IEP for Zachary. There is no contention that the procedure followed by HCDE in formulating this particular IEP was in any way faulty.

Pursuant to this IEP, Zachary attended a comprehensive development class ("CDC") at Ooltewah Elementary School, an HCDE public school. Because Zachary was only of pre-school age, this class did not include normal children, who must wait until they are older to attend kindergarten. The class consisted only of pre-school children such as Zachary, all of whom had special needs, but all of whom had better communication and social skills than Zachary.

The IEP team convened additional meetings in October 1997 to revise Zachary's IEP. The CDC class was comprised of ten students, who had two team teachers, Lisa Steele and Ann Kennedy, both of whom were qualified to teach children with autism. In addition, speech therapy was provided by Paula Wiesen, a certified speech language pathologist. During this period, Zachary did receive individual attention, which included applied behavior analysis ("ABA") techniques. Until Christmas 1997 Zachary attended this class and made some progress. However, during the latter half of the 1997–98 school year, Zachary only attended the CDC class thirty-five percent of the time provided in the IEP, this despite the Deals having approved of the 1997–98 IEP. Zachary's absence effectively prevented the HCDE from implementing the IEP.

In the meantime the Deals began teaching Zachary outside of school using a program developed by the Center for Autism and Related Disorders ("CARD"). This program, according to the ALJ, is patterned after a methodology for treating autistic children developed by Dr. Ivar Lovaas at the University of California at Los Angeles. This methodology, as well as many other methodologies for treating autism utilizes ABA, which is a psychological approach based on behaviorism, and operates on the premise that people learn from their environment. The ALJ characterized this as "Lovaas-style ABA." By

way of additional evidence, not available to the ALJ, this Court has heard expert testimony from Doctors Burton Leaf and Betty Jo Freeman. Dr. Leaf worked with Dr. Lovaas when the methodology was being developed in the 1970s. Dr. Freeman is currently a Professor at UCLA Medical School in the Department of Medical Psychology. According to both of these highly qualified experts, the methods for treating autism are continually changing, and that while the CARD program does take a behavioral approach, neither it, nor any other program, can accurately be described as "Lovaas-style ABA." There were several meetings of the Deals and school personnel during the 1997–98 school year. In May 1998, an IEP team met wherein the Deals requested extended year services ("ESY") for the summer in the form of a 40–hour per week one-on-one home-based "Lovaas-style ABA" program. The outcome, however, was that HCDE would provide Zachary the services of Anna Davenport, Zachary's private speech therapist, for three 45–minute therapy sessions per week. The Deals agreed to this.

With the agreement of all parties, the next IEP meeting was held on October 15, 1998. Zachary was then four years old. At this time, a 95–page IEP was prepared. This plan provided, among other things, for 35 hours per week special education instruction, with many explicit goals. Zachary also would have related services including physical therapy and speech therapy. The Deals thereafter filed a "minority report" wherein they expressed the view that HCDE should provide them with their CARD program. The Deals sent Zachary to public school only sixteen percent of the time during the 1998–99 school year. There were several IEP meetings throughout this school year at which the Deals' concerns were discussed. In fact, over the two-year period from 1997 into 1999, there were approximately a dozen

meetings between the Deals and HCDE teachers and administrators. These meetings consumed approximately 500 staff hours of HCDE employees.

At a May 1999 IEP meeting the Deals again requested a summer ESY program of 43 hours per week of one-on-one ABA therapy, and five hours per week of speech therapy. Since Zachary had not been attending school in accordance with the previous IEP, the HCDE was not able to evaluate his need for those services, and declined to offer them.

In August 1999 there were two IEP team meetings to develop a plan for the 1999–2000 school year. At this time Zachary was five years old. The 1999–2000 IEP was again very extensive. HCDE proposed that Zachary would, in addition to his CDC classes, attend a regular kindergarten classroom in duration, three times per week for 15 minutes each, as well as lunch with a regular kindergarten classroom. This time was to be increased as Zachary was able to tolerate it. He would have with him a classroom assistant familiar with and trained to meet Zachary's needs. The IEP provided for one-on-one discreet trial teaching ("DTT"). The IEP called for the use of picture cues; incidental teaching to provide opportunity for carryover and application of learned skills; continual use of functional communication techniques with hand-over-hand physical prompts; as well as picture and visual prompts as necessary; activity-based instruction focusing on Zachary's interests; picture exchange communication ("PEC") system; use of storytelling, music, reading for listening, questioning, answering, behavior and following directions; and other teaching methods. The IEP also provided speech and language therapy for 30 minutes five times per week; occupational therapy two times per month, and physical therapy once per week for 30 minutes.

The Deals were not pleased with this. It was their opinion that Zachary must receive, at HCDE expense, their CARD program. On September 16, 1999, the Deals, in a long letter from their lawyer, first requested a due process hearing under the provisions of IDEA. This hearing effectively triggered this litigation. The Deals had already, without notifying the HCDE, enrolled Zachary in a private school, The Primrose School. Zachary did not attend public school during the 1999–2000 school year. Obviously for that reason, HCDE was unable to implement the 1999–2000 IEP.

In August 2000, there was another IEP meeting, at which an IEP plan was prepared for the ensuing year. This plan called for Zachary to be placed in a regular kindergarten class with specified objectives, and with many special considerations to deal with Zachary's special needs. He would also receive one-on-one speech therapy five times per week, as well as occupational therapy. The Deals again took the position that Zachary must be provided their one-on-one ABA program. He did attend Westview Elementary (HCDE) that year, but only part time.

### IV.

### *Analysis*

The determination of whether HCDE complied with IDEA is distilled into answering two questions:

(1) Has HCDE complied with the procedures set forth in the statute?; and

(2) Is the challenged IEP "reasonably calculated to enable the child to receive educational benefits"?

*Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034; *Knox County Schools,* 315 F.3d at 693; *Knable,* 238 F.3d at 763; *Burilovich,* 208 F.3d at 565; *Tucker,* 136 F.3d at 501–02. This, as set forth above, is the *Rowley* test.

## A. *Procedure*

■ As the Supreme Court first recognized in *Rowley,* the procedural safeguards in IDEA are important because they provide all parties, particularly the parents, with participation in the development of the IEP. 458 U.S. at 205–06, 102 S.Ct. 3034. The ALJ found "significant procedural violations of the IEP process" in this case. The ALJ erred. The ALJ seems to have concluded that HCDE failed to follow statutory procedures by making a pre-determination about what Zachary's IEP should be. However, contrary to the ALJ's determination, there was no such procedural violation in this case. One thing that stands out about all the many IEP meetings in this case is that the Deals were present at every one of them; and that at every one of those meetings the Deals took the opportunity to forcefully advocate their position. While HCDE did not agree with the Deals, and while they may have even come to IEP meetings with a definite point of view, this does not amount to a procedural violation.

The United States Court of Appeals for the Sixth Circuit has recently held that "when a parent fully participates in the IEP meeting and is an active participant in the final determination of the child's eligibility, there is no substantive harm caused where school appointed experts and school officials confer *ex parte* so as to coordinate the drafting of an assessment report." *Knox County Schools,* 315 F.3d at 694. As the Sixth Circuit has observed, prudence requires that school districts do some pre-planning. *Id.* at 693–94 n. 3. HCDE could come to IEP meetings with pre-formed opinions regarding the best course of action for Zachary so long as school officials were willing to listen to the Deals, and the Deals had the opportunity to make objections and suggestions. *Id.* at 694.

As related above, there were about a dozen of these IEP meetings with the Deals. Many of these were lengthy. HCDE devoted many staff hours to this issue in just the first two years (1997–99). A review of the IEPs reveals that HCDE went to great lengths to listen to the Deals. The Deals reported in detail Zachary's development and acquired skills. These were duly recorded in the IEPs by HCDE. Along with other IEP meeting participants, the Deals mutually arrived at a number of goals for Zachary; and while the Deals did not prevail in their quest for "Lovaas-style ABA" via the CARD program, all parties did indeed reach agreement from time to time on some things, including some classroom instruction as well as related services, including speech therapy. There is nothing in IDEA which requires school systems to accept the parents' point of view, or suffer a procedural violation of the statute. The facts of this case do not add up to predetermination on the part of HCDE.

■ The ALJ also determined that "the failure to have regular education teachers attend the IEP team meetings is also a troubling procedural violation." In fact, however, the ALJ's findings only catalog two IEP meetings (October 1998 and February 1999) where a regular school teacher was not present. There was no statutory requirement that a regular education teacher be present at IEP meetings prior to 1998. The Sixth Circuit has concluded that: "a procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents." *Knable,* 238 F.3d at 765; *see also Knox County Schools,* 315 F.3d at 693; *Guest,* 193 F.3d at 464–65. It is obvious in this case that the absence of a regular school teacher at these two meetings did not cause substantive harm to

Zachary or his parents. In October 1998, Zachary was four years old. He would not have been attending regular school during the 1998–1999 school year because he had not reached age five. It is difficult to see what meaningful contribution a regular school teacher could have made to this meeting. The February 1999 IEP meeting was held at a time when the IEP for the 1999–2000 school year had long been formulated, and during a time when Zachary was not even attending an HCDE school. Again, it risks stating the obvious to conclude that this had no effect on the welfare of Zachary or the Deals.

■ The ALJ also concluded that "a well established IEP team must have someone on it who is knowledgeable about Lovaas-style ABA and who has an open mind about whether or not to recommend ABA for autistic pre-school children." This is clearly erroneous. There is *no* requirement under IDEA that a school district "include an expert in the particular teaching method preferred by the parents . . ." *Burilovich,* 208 F.3d at 569; *Dong,* 197 F.3d at 801. In view of the discussion below regarding education methodologies, it would indeed be antithetical to IDEA to require that an IEP team contain any member that is disposed toward any particular methodology.

In sum, the ALJ erred in concluding that there were procedural violations here that denied Zachary a FAPE.

**B. *Substantive***

■ In deciding whether the HCDE IEPs substantively provided Zachary a FAPE, considerable deference is due HCDE's educational decisions in view of this Court's conclusion that IDEA's procedural requirements have been met. *Burilovich,* 208 F.3d at 566; *Dong,* 197 F.3d at 800; *Tucker,* 136 F.3d at 502; *Roncker,* 700 F.2d at 1062.

As related above, parents of a handicapped child may receive reimbursement when they withdraw their child from public school. *Burlington,* 471 U.S. at 369, 105 S.Ct. 1996. However, they are entitled to reimbursement "only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence County,* 510 U.S. at 15;, 114 S.Ct. 361 *Knable,* 238 F.3d at 763, 770. While this Court has heard considerable evidence concerning whether the educational course which the Deals chose for their son outside of public school was appropriate, this case need not be decided on the merits or demerits of that program. Instead, the Court's focus is upon whether the educational program provided by the HCDE as embodied in its IEPs for Zachary would have provided Zachary with a FAPE. Pursuant to the definitions contained in IDEA, a " 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley,* 458 U.S. at 188–189, 102 S.Ct. 3034. This Court concludes, contrary to the ALJ, that HCDE has at all times provided a FAPE to Zachary.

The ALJ concluded the only educational methodology that would provide Zachary with a FAPE is one that includes "an intensive Lovaas-style component." The ALJ's decision ignores the admonition of the Supreme Court in *Rowley* that "the courts must be careful to avoid imposing their view of preferable educational methods upon the States," 458 U.S. at 207, 102 S.Ct. 3034; and that IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authority." *Rowley,* 458 U.S. at 205, 102 S.Ct. 3034 (quoted in *Burilovich,* 208 F.3d at 566);

*Renner*, 185 F.3d at 641; and *Thomas*, 918 F.2d at 624.

The ALJ is critical of the HCDE's IEPs for Zachary, contending that the IEPs provide an eclectic mix of methodologies other than "Lovaas-style ABA," using particularly a methodology named TEACCH; and the ALJ seems to be of the opinion that HCDE should be offering a program that can be described as a unified methodology such as, what the ALJ terms, "Lovaas-style ABA."[2] However, nowhere in IDEA is there a requirement that a FAPE cannot be eclectic, or cannot employ multiple teaching approaches. The Act does not specify *any* particular methodology. Indeed, Dr. Freeman testified there is no scientific consensus that any one method of treating autism is any better than another.[3] The Act, said the Supreme Court in *Rowley*, only provides a "basic floor of opportunity" consisting of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034.

The ALJ is also critical of HCDE because it considered cost in arriving at the methodology embodied in its IEPs and in ruling out "Lovaas-style ABA." Again, the IDEA contains no prohibition against a school district considering cost in the formulation of an IEP so long as the IEP provides a FAPE for the handicapped child. *Clevenger v. Oak Ridge School Bd.*, 744 F.2d 514, 516–17 (6th Cir.1984); *J.P. ex. rel. Popson v. West Clark Community Schools*, 230 F.Supp.2d 910, 941 (S.D.Ind. 2002); *L.B. v. Nebo School Dist.*, 214

F.Supp.2d 1172, 1188 (D.Utah 2002); *Matta v. Bd. of Educ.-Indian Hill ex. Vil. Schools*, 731 F.Supp. 253, 255 (S.D.Ohio 1990). While it is certainly recognized that it costs more to educate children with handicaps, it would not be a responsible caretaking of the public fisc for a school district to fail to take cost into consideration.

The ALJ made a finding that TEACCH, one of the methodologies employed by the HCDE, is currently the "most widespread methodology" used by school systems today, yet the ALJ still found that the HCDE program was not a FAPE because HCDE "failed to produce convincing evidence that their methodology for young children with autism was equal to or better than a program based primarily on ABA intervention." The ALJ thus effectively reversed the burden of proof. It is the Deals, not HCDE, who must bear the burden of proving that IEPs are inappropriate. *Tullahoma City Schools*, 9 F.3d at 458; *Knable*, 238 F.3d at 768. Moreover, it is not necessary to FAPE status that the HCDE program be equal to or better than the parents' preferred methodology. It is sufficient under IDEA for HCDE to provide a "serviceable Chevrolet" in the face of the Deals' demand for a "Cadillac." *Tullahoma City Schools*, 9 F.3d at 459–460.

The ALJ concludes that HCDE did not, in its 1999–2000 IEP, plan to educate Zachary with "typically developing peers" to the maximum extent possible. Instead, according to the ALJ, Zachary was "offered, basically a year of education in a

---

**2.** In finding the facts the ALJ made curious "credibility" findings on various witnesses. It appears that for the most part, if the witness happened to espouse views favorable to "Lovaas-style ABA" they were "credible." If they did not espouse those views, they were "not credible."

**3.** This conclusion is borne out in a recent review of the literature on autism published by the National Academy of Sciences, entitled *Educating Children with Autism* (National Academy Press, 2001). This Court has been unable to locate any reference to "Lovaas-style ABA" in this 229–page book.

CDC classroom where every single child was disabled." It is true that IDEA and its regulations do express a preference for educating handicapped children in the least restrictive environment to the maximum extent appropriate. *Tennessee Department of Mental Health,* 88 F.3d at 1471; 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.550–556. However, given the facts of this case, it cannot be said that the HCDE failed to comply with IDEA in this regard. In fact, the IEP for 1999–2000 did provide for gradually working Zachary into a regular kindergarten class. Moreover, even in his CDC class, the other children functioned at a higher level than did Zachary; and his teacher, Lisa Steele, observed that Zachary did not model bad or inappropriate behavior of the other children in the CDC class.

Two very well qualified experts, David J. Rostetter, and Betty Jo Freeman, Ph.D., testified before this Court that they had thoroughly examined the HCDE IEPs. They both concluded independently that the IEPs did indeed provide Zachary with a FAPE. A review of recent case law also reveals that courts have consistently rejected parents' claims that some version of "Lovaas" treatment for autism is necessary to provide a FAPE. *Burilovich,* 208 F.3d 560 (Lovaas "DTT"); *Dong,* 197 F.3d 793 ("Lovaas-style DT" is an "appropriate methodology as well as TEACCH"); *Renner,* 185 F.3d 635 ("Lovaas-style DTT," finding "no consensus within the educational or medical communities on the most effective way to treat autism in pre-primary age children"); *Popson,* 230 F.Supp.2d at 910 (Lovaas "ABA/DTT" versus an "eclectic intervention" approach).

HCDE's program was appropriate for Zachary, not only because it provided an acceptable methodology, but because HCDE had qualified personnel to implement it. For example, Lisa Steele, the HCDE designated special education teach-er, has a state teaching certification for special education, a masters degree, and graduate courses. She also has experience with ABA. There is considerable evidence that Zachary made acceptable progress during the short time the Deals permitted him to attend public school.

Although this Court cannot conclude that the Deals' placement of Zachary in private school, and their single minded pursuit of one-on-one "Lovaas-style ABA" was not appropriate, there is testimony from Drs. Freeman and Leaf in the record that would support such a conclusion. As Dr. Leaf testified, he is not sure what is meant by the term "Lovaas-style ABA." Dr. Leaf, who worked with Dr. Lovaas and wrote a chapter in a book produced by Lovaas, testified that, in fact, Lovaas and others used varying techniques to address autism. Each child is treated differently. Even Lovaas does not practice exclusively "Lovaas." Moreover, the data cited by the ALJ about the success of the Lovaas methodology is suspect. That data was supposedly produced by Dr. Lovaas and his colleagues, who were working in a clinical setting. The CARD program is based on a "workshop" model which would not be expected to produce the higher results achieved in a clinic at UCLA. The IQ scores for Zachary cited by the ALJ are not particularly helpful or meaningful. In evaluating the progress of autistic children, IQ is very difficult to ascertain and not as important as what a child can or cannot do. In fact, observations by the experts of videotapes of Zachary at The Primrose School and elsewhere, along with observations of HCDE teachers, reveal that Zachary's progress is not what they would have expected from a program different from that provided to Zachary by his parents. Aside from whatever results the "Lovaas-style" methodology might achieve, there is also evidence that the TEACCH methodology utilized by HCDE

also achieves results, and this methodology is not in fact out of date, the ALJ's conclusions to the contrary notwithstanding.

The truth is, there are a number of effective ways to deal with autism. Methodologies are continually changing with the acquisition of more scientific knowledge. As the Supreme Court recognized in *Rowley,* courts must be mindful that they lack the " 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy." ' 458 U.S. at 208, 102 S.Ct. 3034 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. at 42, 93 S.Ct. 1278). Congress did not intend in the IDEA, to tie the hands of educators to any particular way of dealing with autism, or any other handicap.

## V.

### *Conclusion*

The ALJ concluded that HCDE denied Zachary a FAPE because it did not provide him "intensive Lovaas-style ABA." The ALJ therefore ordered HCDE to reimburse the Deals for the home-based ABA program received by Zachary after May 11, 1998. This was error. This Court, as related above, is required to give due weight to the ALJ's finding of fact. However, deference is not due here where the state and local educational expertise is possessed not by the ALJ, but by HCDE, and where an independent examination of the record reveals factual, as well as legal errors. For these reasons, a judgment will enter **REVERSING** the ALJ's decision insofar as it required HCDE to reimburse the Deals for any of the costs incurred by them in providing education for their son, Zachary. The ALJ denied the Deals reimbursement for certain other costs, *i.e.,* expense of Zachary's attendance at Primrose School and the costs of certain evaluations. To this extent, the decision of

the ALJ is **AFFIRMED,** there being no error in those particular conclusions.

A judgment will enter.

### *JUDGMENT*

This case came before the Court for a hearing on January 23 and 24, 2003. For the reasons expressed in the memorandum opinion filed herewith, the decision of the Administrative Law Judge ("ALJ") is **REVERSED IN PART AND AFFIRMED IN PART.** The Hamilton County Department of Education is not required to reimburse Maureen and Phillip Deal for any of the costs incurred by them in providing education to their son, Zachary, outside the classes and training provided by the Hamilton County, Tennessee Department of Education. The Hamilton County Department of Education shall recover of the plaintiffs its costs of action.

**SO ORDERED.**