significant differences in determining that section 504 procedures were faulty, we must reverse.

### III

The judgment of the district court is **reversed**. We **remand** the IDEA claims to the district court for a decision on the merits consistent with our holdings in *Burilovich* and *Knable* requiring that district courts give modified de novo review to administrative proceedings in IDEA cases. We also **remand** the section 504 claims for a decision on the merits consistent with the line of cases cited above holding that section 504 claims are dismissed when IDEA claims brought on the same theory are dismissed.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2003 FED App. 0022P (6th Cir.)
File Name:  03a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

N.L., a minor, by her mother,
Ms. C., as next friend, and
Ms. C., individually,
    *Plaintiffs-Appellees,*

        *v.*

KNOX COUNTY SCHOOLS;
CHARLES LINDSEY,
Superintendent of Knox
County Schools,
    *Defendants-Appellants.*

No. 01-5551

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 99-00423—James H. Jarvis, District Judge.

Argued:  September 12, 2002

Decided and Filed:  January 16, 2003

Before:  NORRIS and CLAY, Circuit Judges; O'MEARA,
District Judge.[*]

————————

[*]The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

—————————

**COUNSEL**

**ARGUED:**   Charles L. Weatherly, THE WEATHERLY LAW FIRM, Atlanta, Georgia, for Appellants.  Dean Hill Rivkin, Knoxville, Tennessee, for Appellees.  **ON BRIEF:** Charles L. Weatherly, Wendy A. Jacobs, THE WEATHERLY LAW FIRM, Atlanta, Georgia, Susan E. Crabtree, KNOX COUNTY LAW DEPARTMENT, Knoxville, Tennessee, for Appellants. Dean Hill Rivkin, Knoxville, Tennessee, Brenda McGee, Knoxville, Tennessee, for Appellees.

—————————

**OPINION**

—————————

   ALAN E. NORRIS, Circuit Judge.  This case concerns two federal statutes promoting the access of students with disabilities to educational opportunities, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (1994), and section 504 of the Rehabilitation Act of 1973 ("section 504"), 29 U.S.C. § 791 *et seq.* (1994).  Defendants are the Knox County, Tennessee schools and school superintendent Charles Lindsey (collectively, the "school system").  Plaintiffs are minor child N.L. and her mother, Ms. C., as next friend.

   On January 11, 1999, IDEA and section 504 evaluation teams convened by the school system determined that N.L. was ineligible for special assistance under either statute.  Ms. C. was the sole dissenting member of both teams.  After N.L. was determined ineligible, Ms. C. requested a due process hearing for her daughter under the IDEA.  At the conclusion of the due process hearing, the administrative law judge affirmed the finding of the IDEA team. Ms. C. then appealed the administrative decision to the district court.  The district court agreed to hear both the IDEA and section 504 claims, having jurisdiction over the IDEA claims pursuant to 20

disabled child is ineligible for placement under the IDEA, he is also ineligible under section 504); *Doe v. Arlington County Sch. Bd.*, 41 F. Supp. 2d 599, 608 (E.D. Va. 1999) (noting that when the IDEA claims are dismissed, section 504 claims on same allegations are also dismissed).

   In sum, precedent has firmly established that section 504 claims are dismissed when IDEA claims brought on the theory of a denial of free appropriate public education are also dismissed.   These holdings make sense in light of section 504's general applicability and its status as an anti-discrimination statute.  *See Smith*, 468 U.S. at 1019.[5]

   Thus, the school system was on firm ground when it relied on the evaluations and conclusions of the IEP Team to also conclude that N.L. was not eligible for services under section 504.   In finding that the school violated section 504 procedures, the district court held that N.L.'s eligibility "under § 504 should be determined by the full S-Team [section 504 assessment team] or 504 Committee examining the appropriate standards under § 504 rather than under the IDEA."  Because the district court relied on its erroneous conclusion that IDEA and section 504 eligibility have

—————————

   [5]Plaintiffs argue that the determination of IDEA eligibility and section 504 eligibility are distinct, relying almost solely on dictum in a footnote to *Muller v. Committee on Special Education*, 145 F.3d 95, 100 n.2 (2d Cir. 1998).  In *Muller,* the second circuit noted, "The definition of 'individual with a disability under section 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disabilit[y].'" *Id.*  A better understanding of *Muller*, however, is provided by its actual holding.  The court held that the plan promulgated under section 504 to deal with a student's disability was not an appropriate substitute for an IEP under the IDEA because an IEP would be designed to meet a student's unique needs through an individualized program. *Id.* at 105.  Thus, *Muller* stands for the proposition that the requirements of the IDEA cannot be met through compliance with section 504 because the IDEA requires an individualized program while section 504 is a broad anti-discrimination statute.  *Muller* does not contradict the holdings that a student who does not qualify under the IDEA also does not qualify under section 504.

## C.  The School System's Section 504 Procedures

In order to establish a violation under section 504, a disabled individual must establish that he was subjected to prohibited discrimination, which means he was denied the opportunity to participate in or benefit from the aid, benefit, or service because of a disability.  34 C.F.R. § 104.4(b).  In the context of education services, the Supreme Court held in *Smith v. Robinson*, 468 U.S. 992 (1984), that section 504 does not require affirmative efforts to overcome the disabilities caused by handicaps, but instead "simply prevents discrimination on the basis of handicap." *Id.* at 1017.  The Supreme Court further held that nothing in section 504 adds anything to the substantive right to a free appropriate public education.  468 U.S. at 1019.  To prove discrimination in the education context, courts have held that something more than a simple failure to provide a free appropriate public education must be shown.  *See Monahan v. Nebraska,* 687 F.2d 1164, 1170 (8th Cir. 1982)*; see also Lunceford  v. D.C. Bd. of Educ.,* 745 F.2d 1577, 1580 (D.C. Cir. 1984).

In *Smith*, the Supreme Court also held that any action for discrimination in education must be limited to an action under the IDEA.  *See* 468 U.S. at 1009.  In 1986, Congress addressed this holding through an amendment to the IDEA, 20 U.S.C. § 1415(l), which provides, "Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under...title V of the Rehabilitation Act of 1973 [29 U.S.C. §§ 790 *et seq.*]. . . ."

This amendment has not been held to have altered the prior holdings that more harm is required than a denial of free appropriate public education to make out a section 504 claim.  *See Sellers by Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 529 (4th Cir. 1998) (citing *Monahan,* 687 F.2d at 1170 and *Lunceford,* 745 F.2d at 1580); *see also Urban v. Jefferson County Sch. Dist.* 89 F.3d 720, 728 (10th Cir. 1996) (finding that the similarity between the substantive and procedural frameworks of the IDEA and section 504 means that, if a

U.S.C. § 1415(i)(2)(A) & (3)(A) and over the section 504 claims pursuant to 28 U.S.C. § 1331.  After reviewing the evidence, the district court declined to rule on the merits of the case, but instead found that procedural errors occurred during the school-level eligibility determination process under both statutes.  The district court's final order required the school system to reconvene evaluation teams to reconsider N.L.'s eligibility under both statutes.  The school system appeals from this remand.  We now reverse the district court's decision.

### I

The purpose of the IDEA is to guarantee children with disabilities access to a free appropriate public education.  *See* 20 U.S.C. § 1400(d)(1)(A).  Under the IDEA, a school system conducts an initial evaluation to determine if a child qualifies for special education or related services in the form of an Individualized Education Program ("IEP").  *See* 20 U.S.C. § 1414(d)(1)(A).  To conduct its evaluation, the school sets up an Individualized Education Program Team ("IEP Team") comprised of the parents, at least one teacher of the child, a special education teacher, a representative of the local education department, "an individual who can interpret the instructional implications of the evaluation results," and any other individuals with special expertise.  *See* 20 U.S.C. § 1414(d)(1)(B).  Tennessee regulations require schools first to create an evaluation team composed of experts to develop an "assessment report" which is then presented at the IEP Team meeting.  *See* Tenn. Rule 0520-1-9.01 (4) a-b (September 1999).  If the IEP Team fails to certify a student for an IEP, 20 U.S.C. § 1415(f) permits the parent to request a due process hearing.  The hearing must abide by certain procedural safeguards, and the IDEA gives parents the right to counsel and outside experts.  *See generally* 20 U.S.C. § 1415.

The purpose of section 504 is to ensure that disabled individuals have the opportunity to participate in or benefit

from the aid, benefit, or service of any program receiving federal financial assistance. *See* 29 U.S.C. § 794(a). Programs receiving federal financial assistance include public schools. *See* 29 U.S.C. § 794(b)(2)(B).

There can be no doubt that the child at issue here, N.L., had a long history of behavioral and scholastic problems. In 1993, when N.L. was seven years old and in the second grade, she was certified as disabled under the IDEA as "Health Impaired" based on a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD"). N.L.'s behavior included biting, kicking, disrespect toward adults, and the use of vulgar language. As required by the IDEA, the school developed an Individualized Education Program ("IEP") and a behavior management plan. Achievement test scores suggest N.L. made decent educational progress over the next few years. At the beginning of her fifth-grade year in 1996, N.L. began the recertification process under the IDEA. In January 1997, an IEP Team meeting decertified N.L. as Health Impaired. Over the previous two years, she had received average to above average grades in most areas measured.

The next school year, the family moved to Baltimore, Maryland where N.L. attended the sixth grade for one semester. Some of N.L.'s grades that semester were failing. Her school report from Baltimore indicated that her "conduct interferes with [her] learning."

In January 1998, N.L. returned to the Knox County school system and problems persisted. A parent-teacher conference was held because N.L.'s behavior was "getting in way of academic progress." Her grades were a low C-average during the spring semester. According her mother, N.L. attended summer school but was dismissed because of behavioral problems.

By the end of October of her seventh grade year, N.L. received nineteen days of in-school suspension and two days

The district court placed great importance on Ms. Machleit's admission during the administrative hearing that a decision regarding N.L.'s eligibility was made prior to the full IEP Team meeting. In view of the testimony of the participants, however, the assessment report compiled by the experts was not a final determination of N.L.'s eligibility. The experts recognized that they were to come to the meeting with suggestions and open minds, not a required course of action. Parents must have the opportunity to ask questions and voice disagreements at the formal IEP Team meeting. It has not been argued that Ms. C. was denied such opportunities, and the record clearly demonstrates that she was an active participant at the IEP Team meeting.

Accepting the fact that the meetings at issue took place, they do not constitute a substantive harm because the conclusions drawn at the meetings were not a final determination in light of the mother's active participation in the formal IEP Team meeting. While we doubt that the meetings and the assessment report even constitute technical violations of IDEA procedures, we need not determine this issue here as no substantive harm has been shown.

is a full discussion with the child's parents, before the child's IEP is finalized, regarding drafted content and the child's needs and the services to be provided to meet those needs.

34 C.F.R. § 300, app. A, No. 32. There was a dispute between the parties regarding whether this regulation was in force at the time of the meetings at issue, but the previous version of this regulation also clearly suggested that school officials and experts may draft reports and form opinions prior to the IEP Team meeting. *See Burilovich*, 208 F.3d at 568 (citing both versions as suggestive of the fact that a school may prepare information outside the presence of the parents prior to the IEP Team meeting); *compare* 34 C.F.R. § 300, app. A, No. 32 (1999), *with* 34 C.F.R. § 300, app. C, No. 55 (1996).

Plaintiffs argue that the existence of the assessment team report and the contacts between school appointed experts are themselves a premature decision constituting a predetermination of N.L.'s eligibility and hence a substantive procedural harm. In support, they cite 34 C.F.R. § 300, app. A, No. 32, which prohibits the completion of an IEP before the IEP Team meeting.

This argument conflicts with both with the regulation cited to support it and our prior holding in *Burilovich* in which this court referenced 34 C.F.R. § 300, app. A, No. 32 to note that a district staff may prepare information before meeting with parents. 208 F.3d at 568-69. While this regulation refers to a situation in which a child is found eligible for an individualized education program under the IDEA, it is obviously analogous to the circumstances in which the child is found to be ineligible. The regulation prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.[4]

---

[4]The current version of the regulation states in full:

32. Is it permissible for an agency to have the IEP completed before the IEP meeting begins?

No. Agency staff may come to an IEP meeting prepared with evaluation findings and proposed recommendations regarding IEP content, but the agency must make it clear to the parents at the outset of the meeting that the services proposed by the agency are only recommendations for review and discussion with the parents. Parents have the right to bring questions, concerns, and recommendations to an IEP meeting as part of a full discussion, of the child's needs and the services to be provided to meet those needs before the IEP is finalized.

Public agencies must ensure that, if agency personnel bring drafts of some or all of the IEP content to the IEP meeting, there

---

of out-of-school suspension as punishments.[1] Ms. C. testified that she met with the school's principal at this time and requested that N.L. be evaluated and strategies set up to help her, but the principal responded that N.L.'s behavior was not affecting her academic performance. Ms. C. took N.L. to a mental health clinic, where a doctor prescribed Ritalin.

Despite medication, N.L.'s behavior problems continued. Soon after Ms. C.'s meeting with the principal, N.L. was accused of slapping a teacher. In response, the school began proceedings to consider long-term expulsion (N.L. was not ultimately expelled). The school also concluded that an evaluation by an IEP Team was necessary.

The initial school-appointed evaluation team was comprised of Sandra Machleit, a school psychologist, Dr. Michael Greer, a private psychiatrist, Dr. Vance Sherwood, a private psychologist, and Suzanne Hartsell, a social worker. Prior to the full IEP Team meeting, these experts conducted evaluations of N.L., interviewed her mother, and wrote an assessment report as specified by Tennessee regulations. *See* Tenn. Rule 0520-1-9.01 (4) a-b (September 1999). The report found that N.L. did not meet the criteria to qualify as a disabled student under the IDEA. The experts agreed that N.L. had ADHD but concluded that N.L.'s behavioral problems were volitional and not caused by her disability. (They noted that N.L. could control her behavior under many circumstances and that behavioral problems are not usually associated with ADHD.)

The IEP Team meeting was held on January 11, 1999, at which the evaluators and Ms. C. were present, as well as the principal, a special education consultant, a special education supervisor, and one of N.L.'s teachers. With the exception of

---

[1]The school disciplinary report on N.L. from the fall semester lists sixteen separate incidents, including the use of obscenity, disrespect, throwing a chair at another student, class disturbances, leaving the classroom without permission, and fighting with another student.

Ms. C., the IEP Team concluded that N.L. was not eligible for special education under the IDEA. Ms. C. was an active participant in these meetings and not only registered her disagreement with the IEP Team's conclusion but also requested alterations to the reports. According to Ms. C., following the IEP Team meeting school personnel composed largely of the same group held a section 504 meeting that lasted about five minutes. N.L., again over Ms. C.'s objections, was found ineligible for special services under section 504.

After a due process hearing conducted at Ms. C.'s request, the administrative law judge upheld the IEP Team's earlier determination that N.L. was not eligible to receive specialized services under the IDEA. On appeal from the administrative decision, the district court first considered whether the school system had complied with the procedural requirements of the IDEA. Based on the meeting of the experts who issued the assessment report prior to the formal IEP Team meeting, the district court concluded that the school system had violated provisions of the IDEA that require full, fair, and informed parental participation in the process. In support of this holding, the district relied heavily on the following exchange between Ms. Machleit, and N.L.'s counsel during the due process hearing:

Q. Did you conclude at the pre M-Team [pre-IEP Team] meeting that N.[L.] did not meet criteria?
A. Under IDEA, that's true.
Q. So the meeting before January 11, 99, the decision was she did not meet certification under IDEA?
A. That's true.

Based on this testimony, the district court found that, prior to the IEP Team meeting, Ms. Machleit met with other members of the evaluation team, and they concluded that N.L. did not meet the requirements for eligibility under the IDEA, thus

As in *Burilovich*, the record before us clearly indicates that the alleged procedural faults did not seriously infringe upon Ms. C.'s opportunity to participate in the IEP Team meeting. Unlike the parents in *Knable* and *Babb*, Ms. C. was informed of N.L.'s problems at school, she attended the key IEP Team meeting, expressed her disagreement with the IEP Team's conclusions, and even requested alterations in the IEP Team reports. As in *Burilovich*, the plaintiffs here fail to cite authority holding that the mother must be present at all meetings or that discussions concerning eligibility cannot take place outside the presence of the mother.[3] Taken together, our holdings in *Burilovich* and *Knable* suggest that when a parent fully participates in the IEP Team meeting and is an active participant in the final determination of the child's eligibility, there is no substantive harm caused when school-appointed experts and school officials confer ex parte so as to coordinate the drafting of an assessment report.

Indeed, it is far from clear that such meetings constitute even technical violations of IDEA procedures. The school system points out that it is standard practice for an assessment team to draft a report before the IEP Team meeting, and we do not see how the school could carry out its duties under the IDEA absent reports from experts. Tennessee regulations require an assessment team to evaluate a student's eligibility and prepare an assessment report prior to the IEP Team meeting. *See* Tenn. Rule 0520-1-9.01(4)a-b (September 1999).

---

[3] The plaintiffs cite *Honig v. Doe*, 484 U.S. 305 (1988), in support of their argument that the mother must be present at all meetings. In *Honig*, the Supreme Court noted that the IDEA had established "various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Id.* at 311-12. This language can hardly be construed as prohibiting school officials or school-appointed experts from forming opinions or compiling a report prior to the full meeting. Indeed, without some organization and evaluation prior to the IEP Team meeting, it is unclear how an IEP Team could make reasonable and informed decisions.

[A] procedural violation of the IDEA is not a per se denial of a FAPE [free appropriate public education]; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of FAPE only if such violation causes substantive harm to the child or his parents. Substantive harm occurs when the procedural violations in question *seriously infringe* upon the parents' opportunity to participate in the IEP process.

*Knable*, 238 F.3d at 765 (citations omitted) (emphasis added). In *Knable*, we concluded that failure to hold an IEP meeting constituted a substantive harm. *Id.* at 766-67. We reached a similar conclusion in *Babb v. Knox County Schools*, 965 F.2d 104 (6th Cir. 1992). Reversing the district court, we held that the student met the criteria for emotional disturbance under the IDEA and that the school did not inform the parents of the seriousness of the student's disruptions and punishments at school. *Id.* at 107-08.

In *Burilovich*, we addressed the procedural issues raised by meetings held outside the presence of the parents in the context of an alteration to an existing IEP:

Plaintiffs have not indicated how they were prevented from participating in the development of the IEP. The parents attended a December 1996 IEPC [Individualized Educational Program Conference], strongly expressed their views at the March 1996 IEPC, had the opportunity to participate in the May 1996 IEPC, and also expressed their views through letters and telephone conversations with district staff. Furthermore, plaintiffs have cited no support for their implicit assertion that schools may never discuss a child's IEP, goals, objectives, or educational methodology out of the presence of the parents. For these reasons, plaintiffs have failed to demonstrate that they were denied participation in the IEPC process.

208 F.3d at 568 (citation omitted).

depriving Ms. C. of her right to participate in this "initial determination" of N.L.'s eligibility.[2]

The specific nature of these meetings is disputed by the defendants. They contend that any meetings were merely organizational and necessary for the evaluators to complete the assessment report to be given to the IEP Team. Dr. Sherwood and Dr. Greer testified at the administrative hearing that they understood that only the IEP Team could make the actual eligibility determination and that their role was limited to the contribution of their expertise. Notably, Ms. Machleit did not testify and the district court did not find that a final determination was made prior to the IEP Team meeting.

Regarding the section 504 meeting, the district court concluded that the school had not applied the proper standards when it denied eligibility by merely referencing the report and conclusions of the IDEA Team.

Having found these procedural violations, the district court declined to reach the merits. The court reached the following conclusion:

If this were a case where the student was clearly handicapped and entitled to services under the IDEA, the appropriate remedy would be to reverse the ALJ and find that N.L. was deprived of an individualized educational program to meet her special needs. However, that result is not so clear in this case. The questions at issue are close. N.L.'s eligibility under IDEA should be decided by a full [IEP Team] and not beforehand by a portion of

---

[2] The district court also held that "some of N.L.'s teachers" were also left out of the determination of eligibility in violation of IDEA procedures. The statute, however, clearly states that IEP Team must include "at least one regular education teacher" of the child, not all regular teachers. 20 U.S.C. § 1414(d)(1)(B)(ii). The plaintiffs do not argue on appeal that the absence of some of the teachers violated IDEA procedures, so we pursue this finding no further here.

the [IEP Team]. Her eligibility under § 504 should be determined by the full S-Team [section 504 assessment team] or 504 Committee examining the appropriate factors and apply the appropriate standards under § 504 rather than under the IDEA.

Memorandum Opinion, Jan. 26, 2002 at 13 (citations omitted). The district court then remanded the action to the Knox County school system to reconvene an IEP team to reconsider N.L.'s eligibility under both statutes.

## II.

### A. Standard of Review

We apply a clearly erroneous standard of review to the district court's findings of fact and a de novo standard of review to its conclusions of law. *See Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). The district court, however, is required to give "modified de novo review" to the findings of fact in the administrative proceedings under the IDEA. *Id.*

This modified de novo review of administrative proceedings stems from the Supreme Court's decision in *Board of Education v. Rowley*, 458 U.S. 176 (1982), requiring courts to give "due weight" to state administrative proceedings in IDEA cases. *See Knable*, 238 F.3d at 764; *Burilovich v. Board of Educ.* 208 F.3d 560, 565 (6th Cir. 2000) (citing *Rowley*, 458 U.S. at 206). Under a modified de novo standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings, particularly when educational expertise is essential to the findings. *See Knable*, 238 F.3d at 764; *Burilovich*, 208 F.3d at 566. We clarified the meaning of the *Rowley* due weight standard in *Burilovich* as follows:

Because administrative findings in IDEA cases should be afforded less deference than that given to agencies under the substantial evidence test, and in view of the IDEA's preponderance of the evidence standard, we hold that administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both.

*Burliovich*, 208 F.3d at 567.

The plaintiffs correctly contend that the IDEA places a great deal of emphasis on correct procedure. As the Supreme Court noted in *Rowley*:

It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, *e.g.*, §§ 1415(a)-(d), as it did upon measurement of the resulting IEP against a substantive standard.

458 U.S. at 205-06. Regarding procedural matters in state proceedings, we held in *Burilovich* that the IEP process should be reviewed for strict procedural compliance, although technical deviations would not make an IEP invalid. *See* 208 F.3d at 566 (citing *Dong v. Board of Educ.*, 197 F.3d 793, 800 (6th Cir. 1999)).

### B. The School System's IDEA Procedures

In *Rowley*, the Supreme Court held that an IDEA inquiry is twofold. First, a court conducts an examination of prior proceedings for procedural compliance, and then an examination of whether the student's substantive rights to services under the IDEA were violated. 458 U.S. at 206. Interpreting this requirement, we have held: