J.P. and L.P., on behalf of their
minor son, P.P., Appellants
and Cross–Appellees,

v.

ANCHORAGE SCHOOL DISTRICT,
Appellee and Cross–Appellant.

Nos. S–13624, S–13633.

Supreme Court of Alaska.

Sept. 16, 2011.

Sonja D. Kerr, Public Interest Law Center of Philadelphia, Pennsylvania, for Appellants and Cross–Appellees.

Bradley D. Owens and Cheryl Mandala, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellee and Cross–Appellant.

Before: CARPENETI, Chief Justice, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Parents requested that the Anchorage School District evaluate their child for eligibility for special education services. While awaiting the results of the eligibility assessment, the parents arranged for private tutoring. The school district did not assess the child's eligibility within the statutorily-required time, and the parents requested a due process hearing. They also arranged for their child to be privately evaluated to determine whether he was eligible for special education services. The school district subsequently completed its evaluation and determined the child to be ineligible for services. At the due process hearing, the parents alleged that the school district committed procedural violations under the federal Individuals with Disabilities Education Act (IDEA), including impermissibly delaying the evaluation. They sought reimbursement for the cost of their child's private evaluation and tutoring.

An independent hearing officer presided over the due process hearing and ultimately agreed with the district that the child was ineligible for services. But the hearing officer ordered the school district to pay the cost of the private eligibility assessment and to partially pay the cost of the tutoring. The superior court upheld the award of the private eligibility assessment, but reversed the award of the private tutoring cost.

On appeal to this court, the school district argues that the parents should not be reim-

bursed for the evaluation or the tutoring; the parents argue they are entitled to full reimbursement for both expenses. The central question we address is: where a child is ultimately determined to be *ineligible* for special education services, does the IDEA provide relief for procedural violations that occur during the process of evaluating the child's eligibility for services? For reasons explained herein, we affirm the superior court's decision, upholding the independent hearing officer's award of the private assessment cost, but reversing the hearing officer's award of the private tutoring expenses.

## II. FACTS AND PROCEEDINGS

During the 2006–2007 school year, P.P. was in first grade at Turnagain Elementary School in Anchorage.[1] P.P.'s parents, J.P. and L.P., became concerned about P.P.'s reading skills in May of 2007. They orally requested an evaluation for special education services but were told that the Anchorage School District could not conduct an evaluation until the fall. J.P. and L.P. were also unable to obtain an evaluation or services from the district's Department of Indian Education, so they hired a private tutor to work with P.P. during the summer of 2007.

Before P.P. started second grade, J.P. and L.P. wrote a letter to the principal of Turnagain Elementary requesting "a full comprehensive evaluation of our son, [P.P.], for any disability including but not limited to dyslexia and for potential giftedness." The letter was dated August 17, 2007. J.P. and L.P. met with the principal and P.P.'s second-grade teacher on August 21. The parties disagree about what happened at the meeting. J.P. and L.P. contend that they described the tutoring P.P. was receiving, passed on a copy of the tutor's report concerning testing of P.P. that she had done, and asked for help with P.P.'s possible dyslexia. Despite the unambiguous language in

the parents' August 17 letter, the school district argues that the principal and second grade teacher were not sure from the parents' letter what the parents were seeking. The school district also contends that the principal and teacher entered the meeting hoping for clarification, did not receive a copy of the tutor's report, and did not leave the meeting with the impression that the school district had been asked to conduct a special education evaluation.[2] It is undisputed that the district did not give J.P. or L.P. written Notice of Procedural Safeguards—information about their special education rights—as mandated under the IDEA.[3]

As of October 22, 2007, J.P. and L.P. had had no further contact with the school district. The parties agree that this was approximately 45 school days after the parents sent their written request that the district evaluate P.P. for special education eligibility. J.P. and L.P. reiterated their request for the assessment on October 25, and they requested a due process hearing pursuant to the IDEA.[4] Their hearing request alleged that J.P. and L.P. "received no response from [the principal] or any other member of the school district staff concerning the full comprehensive evaluation of [P.P.]" and that "[Anchorage School District] has refused to take any action to evaluate [P.P.] as required by law and has denied him a free appropriate public education as a result."[5] J.P. and L.P. asked that the district be ordered to: (1) pay for an independent evaluation of P.P.; (2) qualify P.P. for special education; (3) reimburse them for the cost of P.P.'s private tutoring and continue to pay for ongoing private tutoring; (4) pay attorney's fees and costs; and (5) create a multi-year individualized education program (IEP) for P.P. J.P. and L.P. simultaneously initiated an independent assessment of P.P. to determine whether he was eligible for special education services; on November 1,

---

1. Initials have been used for all family members to protect their identities.

2. The hearing officer ultimately held that the school district failed to meet its burden of resolving any questions about whether the parents were seeking special education services for their child.

3. 20 U.S.C. § 1415(d) (2006).

4. 20 U.S.C. § 1415(f)(1)(A) (2006).

5. The term "free appropriate public education" comes from the IDEA, 20 U.S.C.A. § 1401(9) (West 2010). *See infra* note 11.

2007, clinical neuropsychologist Dr. Kristi Fuller evaluated P.P. at his parents' request.

An independent hearing officer was appointed to conduct the due process hearing requested by J.P. and L.P.[6] The parties attended a pre-hearing conference with the hearing officer on November 20, 2007 where they agreed upon the issues for the hearing.[7] The hearing officer later reported that she "left with the belief that the [Anchorage School District] would expeditiously provide any forms necessary for an evaluation to parents' attorney[,] then the evaluation process would begin."

Dr. Fuller's report was completed on November 1, 2007 (with a later addendum dated December 19, 2007), and the school district requested a copy of it. The parties disagreed about whether J.P. and L.P. should be required to provide a copy of Fuller's written report before the school district undertook its own evaluation, but J.P. and L.P. ultimately sent a copy of the report to the district after they were ordered to do so on January 7, 2008. The district then began its own evaluation, which was completed on January 29, 2008 when the Turnagain Elementary's special education team met. The team decided that P.P. "was doing well in a general education classroom" and did not require special education services. L.P. and J.P. did not attend the January 29 meeting on the advice of their counsel.

The due process hearing began on February 5, 2008, but it was not completed until July 18, 2008—after P.P. completed second grade. The hearing officer's decision was issued in August 2008. The hearing officer found that: (1) the burden of resolving whether the parents were seeking special education services for P.P. belonged to the school district and the district failed to meet this burden; (2) the district's failure to pass on results of its January 2008 testing in a timely fashion was not deliberate; and (3) the district's January 2008 assessment of P.P. was a more complete picture of P.P.'s performance than the Fuller evaluation and was therefore "entitled to greater weight."

The hearing officer reached the following conclusions of law: (1) though P.P. is a student with "specific learning disabilities," he was not eligible for special education services under the IDEA[8] because he was performing adequately in a general education classroom at the time of the assessment; (2) J.P. and L.P. did not prove that private tutoring was necessary for P.P. to access the curriculum or that private tutoring was what allowed P.P. to perform adequately in school; (3) the school district unduly delayed the evaluation of P.P.'s eligibility for services that it performed pursuant to his parents' request; and (4) the school principal failed to provide J.P. and L.P. with notice of procedural safeguards, as required under the IDEA. The hearing officer ordered the school district to reimburse J.P. and L.P. for the full costs of private tutoring from the date of their initial meeting with P.P.'s principal and second grade teacher (August 21, 2007) through the date of the pre-hearing conference (November 20, 2007). The hearing officer also ordered reimbursement of one-half the costs of private tutoring from the day after the pre-hearing conference to the date the district formally found P.P. ineligible for special education (January 29, 2008). Finally, the hearing officer ordered the district to reimburse J.P. and L.P. for the cost of the Fuller evaluation.[9]

**6.** The required criteria for an independent hearing officer are outlined in 20 U.S.C. § 1415(f)(3)(A) (2006) ("A hearing officer ... shall, at a minimum ... not be ... an employee of the ... agency involved in the education ... of the child; or ... a person having a personal or professional interest that conflicts with the person's objectivity[,]" and shall have the knowledge and ability to understand the provisions of the IDEA, to conduct procedurally appropriate hearings, and to render and write decisions.).

**7.** These were: (1) whether the parents asked the school district to evaluate P.P. for special education; (2) whether the district failed to evaluate

P.P. in a timely manner; (3) whether the parents were entitled to an independent evaluation of P.P. and whether the district must pay for it; (4) whether the parents were entitled to reimbursement for tutoring; (5) whether the parents were entitled to attorney's fees; and (6) whether the hearing officer had the authority to order a multi-year IEP.

**8.** 20 U.S.C.A. § 1401(3)(A) (West 2010).

**9.** The hearing officer awarded full reimbursement for tutoring between August 21, 2007 and November 20, 2007 on the grounds that the

J.P. and L.P. appealed the determination that P.P. was ineligible for services, and the school district appealed the award of tutoring and assessment costs. Because J.P. and L.P. later dismissed their appeal regarding eligibility, the superior court did not address the hearing officer's eligibility determination. After considering the parties' briefing and oral argument, the superior court ruled: (1) because P.P. was not eligible for special education services under the IDEA, and because J.P. and L.P. enrolled P.P. in private tutoring without the school district's consent, the IDEA did not require the district to reimburse P.P.'s parents for the cost of private tutoring; but (2) because school districts have an affirmative, independent duty under the IDEA to evaluate children for special education services within 45 school days after notification that a child may have a learning disability, and because the school district did not meet this obligation, the district was required to reimburse J.P. and L.P. for the cost of the private eligibility assessment.

Both sides appeal the superior court's decision. J.P. and L.P. seek reversal of the superior court's denial of private tutoring costs; the school district seeks reversal of the court's decision regarding evaluation expenses.

## III. STANDARD OF REVIEW

■ This appeal turns on the interpretation of the Individuals with Disabilities Education Act—a question of law. This court reviews questions of law de novo, using its independent judgment to adopt "the rule of law most persuasive in light of precedent, reason, and policy." [10]

## IV. DISCUSSION

### A. The Individuals With Disabilities Education Act.

The IDEA was enacted by Congress "to ensure that all children with disabilities have available to them a free appropriate public education" [11] and "to ensure that the rights of children with disabilities and parents of such children are protected." [12] In relevant part, the IDEA defines "child with a disability" [13] and imposes affirmative duties upon states and school districts receiving federal aid for special education. [14] The "child find" duty requires that "[a]ll children with disabilities residing in the State . . . and who are in need of special education and related services, are identified, located, and evaluated. . . ." [15] A parent, a state educational agency, or any other state agency or local educational agency may initiate a request for an evaluation to determine whether a child is a "child with a disability" under the IDEA. [16] The appropriate agency must conduct "a full and individual initial evaluation" within 45 school days after receiving parental consent

school district was entirely responsible for the delay in evaluation during that period. She awarded only partial reimbursement for tutoring from November 21 to January 29 because she found that both parties shared responsibility for delay during those months; she decided that although the district had a duty to evaluate, there was "no excuse for the parents to not turn over" the private evaluation results requested by the district to assist in their evaluation.

**10.** *Jacob v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008) (internal citations and quotation marks omitted).

**11.** The IDEA, 20 U.S.C.A. § 1401(9) (West 2010), defines a "free appropriate public education" as:

special education and related services that—
(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

**12.** 20 U.S.C.A. § 1400(d)(1) (West 2010).

**13.** A "child with a disability" is one "with . . . speech or language impairments . . . other health impairments, or specific learning disabilities; and . . . who, by reason thereof, needs special education and related services." 20 U.S.C.A. § 1401(3)(A) (West 2010).

**14.** 20 U.S.C. § 1412 (2006).

**15.** 20 U.S.C. § 1412(a)(3) (2006).

**16.** 20 U.S.C. § 1414(a)(1)(B) (2006).

to the evaluation.[17] To determine whether a child has a specific learning disability, a school district is not required to consider "whether a child has a severe discrepancy between achievement and intellectual ability."[18] But school districts should review all existing evaluations of the child, including any private evaluations obtained by the parents.[19]

The IDEA also requires agencies to establish procedures to ensure that children with disabilities and their parents are "guaranteed procedural safeguards with respect to the provision of a free appropriate public education."[20] In 4 AAC 52.480 (2007), the State of Alaska adopted by reference the procedures set out in 34 C.F.R. § 300.504 (2007), the federal regulations adopted pursuant to the IDEA. In relevant part, 34 C.F.R. § 300.504 requires that a copy of the procedural safeguards available to the parents of a child with a disability be given to the parents once per school year and also "upon initial referral or parent request for evaluation."[21] 4 AAC 52.190 (2007) also adopted by reference 34 C.F.R. § 300.503 (2006), which requires that written notice be given to parents of a child with a disability "a reasonable time" before a school district proposes to initiate or refuses to initiate identification or evaluation proceedings.[22] In addition, 20 U.S.C. § 1415(f), AS 14.30.193, and 4 AAC 52.550 (2007) provide that a parent of a child with a disability has the right to request, via written notice, an impartial due process hearing on any issue related to the identification, evaluation, or educational placement of the child.

## B. The Superior Court Applied The Correct Standard Of Review To The Independent Hearing Officer's Decision.

■ J.P. and L.P. argued that the superior court should not review the hearing officer's decision de novo, but should instead rely on "special standards of review required by the IDEA." 20 U.S.C. § 1415(i)(2)(A) and (C) of the IDEA state that "any party aggrieved by the findings and decision made [by a hearing officer] ... shall have the right to bring a civil action" and that in such a civil action the reviewing court "shall receive the records of the administrative proceedings; ... hear additional evidence at the request of a party; and ... basing its decision on the preponderance of the evidence, ... grant such relief as the court determines is appropriate."[23] The United States Supreme Court has held that the requirement that the reviewing court receive records of the administrative proceedings "carries with it the implied requirement that due weight shall be given to these proceedings."[24]

On appeal to this court, J.P. and L.P. again assert that the superior court was obligated to apply the standard of review set out in the IDEA. Other courts have confirmed that trial courts should review an administrative decision issued under the IDEA with the deference implied by the statute's language.[25] But, with regard to conclusions of law, these and other decisions equate the IDEA's "due weight" standard with pure de novo review.[26]

**17.** 20 U.S.C. § 1414(a)(1)(C) (2006) requires that such an evaluation be completed within 60 days of receiving parental consent but provides that a state may set an alternative time frame. 4 Alaska Administrative Code (AAC) 52.115 (2010) requires that, in Alaska, an evaluation must be completed within 45 school days after obtaining parental consent.

**18.** 20 U.S.C. § 1414(b)(6)(A) (2006).

**19.** 20 U.S.C. § 1414(c)(1) (2006).

**20.** 20 U.S.C. § 1415(a) (2006).

**21.** 34 C.F.R. § 300.504(a)(1) (2007).

**22.** 34 C.F.R. § 300.503(a) (2006).

**23.** 20 U.S.C. § 1415(i)(2) (2006).

**24.** *Board of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

**25.** *See, e.g., Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir.1996); *Anchorage Sch. Dist. v. M.P.*, 3AN–05–07009 CI (Alaska Super. April 13, 2006). Some courts have referred to the standard of review under the IDEA as "modified de novo." *See, e.g., N.L. ex rel. Ms. C. v. Knox County Schs.*, 315 F.3d 688, 692 (6th Cir. 2003).

**26.** *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir.2005) ("The appropriateness of a special education placement under the IDEA is

The question in this appeal is clearly one of law: were P.P.'s parents entitled to reimbursement of evaluation and tutoring costs under the IDEA given that P.P. was ultimately deemed ineligible for special education services? The superior court correctly recognized that "neither party disputes the hearing officer's factual findings" and therefore had no occasion to apply the IDEA's "modified de novo" standard for reviewing questions of fact. The superior court correctly applied the de novo standard of review to the hearing officer's conclusions of law. Contrary to the argument raised by J.P. and L.P., application of the de novo standard of review does not impermissibly "limit the authority" of the hearing officer; the superior court was free to independently analyze the legal issues presented by this appeal without deferring to the hearing officer's decision.

### C. The Superior Court Correctly Denied Reimbursement Of Private Tutoring Costs.

■■■■ J.P. and L.P. also argue that the superior court erroneously reversed the hearing officer's award of partial tutoring costs. In support of this part of their appeal, they argue the superior court: (1) failed to recognize that the award of partial tutoring costs was an appropriate remedy within the hearing officer's authority; (2) failed to recognize that P.P. was protected by the IDEA during the evaluation process even though he was eventually found ineligible to receive special education services; and (3) failed to

recognize that J.P. and L.P. had independent parental rights, which were violated when the school district did not timely respond to their request for evaluation and failed to provide them with procedural safeguards or prior written notice that the district did not intend to assess P.P. in a timely manner. These arguments are discussed separately in the parents' briefs, but they amount to a single legal argument: that the IDEA provided procedural protection to P.P. and that the district's failure to abide by the IDEA's procedural protections during the evaluation process entitles P.P.'s parents, who acted on his behalf, to reimbursement for tutoring costs.[27]

The first, narrow question on appeal is whether the district's procedural violations entitle P.P. to relief in the form of reimbursement for tutoring expenses, even though P.P. was not found to be a "child with a disability" eligible for special services. We conclude that they do not.

### 1. Because P.P. is not a "child with a disability" under the IDEA, P.P.'s parents were not entitled to private tutoring for P.P. at school district expense.

■■■ The IDEA defines "child with a disability" as a child:

(i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic im-

---

reviewed de novo."); *Seattle Sch. Dist. No. 1*, 82 F.3d at 1499 (interpreting the language of the IDEA as "calling for de novo review"); *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 528 n. 3 (3d Cir.1995) (noting that, under the IDEA, "[o]bviously, conclusions of law receive plenary review"); *Anchorage Sch. Dist. v. M.P.*, 3AN–05–07009 CI (Alaska Super. April 13, 2006) (finding that the trial court "must review the administrative findings of fact for clear error and the conclusions of law de novo" under the IDEA); *P.N. v. Greco*, 282 F.Supp.2d 221, 235 (D.N.J.2003) ("In reviewing administrative decisions in IDEA cases, a district court applies a de novo standard to questions of law.... Administrative findings of fact are subject to a modified de novo standard of review....").

**27.** P.P. is correct that it is within the discretion and power of hearing officers to award remedial

reimbursement under the IDEA, *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 129 S.Ct. 2484, 2494 n. 11, 174 L.Ed.2d 168 (2009). And he is correct that the IDEA grants parents independent, enforceable rights regarding procedural safeguards and the substantive educational decisions made under the act, *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 530–31, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007). But neither of these points lead to the conclusion that P.P. is necessarily entitled to reimbursement for tutoring costs as a result of the school district's procedural violations. Nor do they override the logic of the superior court in denying such relief; they simply rule out other reasons that reimbursement could have been deemed unavailable.

pairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services.[28]

The need for special education services is determined by a child's ability to keep up with (or "access") the curriculum, without mandatory consideration of "whether a child has a severe discrepancy between achievement and intellectual ability."[29] As the school district reiterates in its briefing, P.P. failed to meet the two-part test set forth in 20 U.S.C. § 1401(3)(A) for eligibility; he was found to have a specific learning disability but he did not meet the second requirement of needing "special education and related services" to access the school curriculum. The district determined that P.P. was ineligible for special education services because he was able to sufficiently access the school curriculum. P.P.'s parents do not challenge this determination on appeal. We therefore conclude that P.P.'s learning disability does not entitle him to private tutoring at school district expense.[30]

**2. The school district's procedural violations did not render P.P. eligible for private tutoring at school district expense.**

■ Other courts have upheld or granted private tuition reimbursement under the IDEA where there have been procedural violations and children were ultimately deter-

mined to be eligible for services.[31] But in *R.B. ex rel. F.B. v. Napa Valley Unified School District*, the Ninth Circuit held that "[a] child ineligible for IDEA opportunities in the first instance cannot lose those opportunities merely because a procedural violation takes place."[32] The United States Supreme Court reached a similar result in *Forest Grove School District v. T.A.*[33] There, the Court affirmed its prior holding that parents " 'are entitled to reimbursement [for private educational expenses] *only* if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act.' "[34] The Court cautioned that "parents who 'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk.' "[35]

Despite the holdings of *R.B.* and *Forest Grove*, some language in federal case law implies that a procedural violation could make IDEA remedies available if the procedural violation *itself* results in a denial of a "free appropriate public education." For example, in *R.B.* the Ninth Circuit wrote: "A procedural violation does not constitute a denial of a [free appropriate public education] *if* the violation fails to result in a loss of educational opportunity."[36] And the Seventh Circuit has held that a "so-called technical violation" (involving the qualifications of an occupational therapist engaged to provide

28. 20 U.S.C.A. § 1401(3)(A) (West 2010).

29. 20 U.S.C. § 1414(b)(6)(A) (2006).

30. J.P. and L.P. argue that the superior court "misunderstood" the holding of *Forest Grove*, 129 S.Ct. at 2484. We interpret this part of their argument to be that although P.P. was found ineligible for special education services, they should still recover the cost of private tutoring because it was the tutoring that allowed P.P. to function at grade level—and ultimately prevented him from qualifying for special education services. This argument relies on the parents' challenge to the hearing officer's finding that tutoring was neither definitively the cause of, nor necessary for, P.P.'s academic success. That finding of fact was neither appealed to the superior court nor properly a part of the appeal to our court.

31. *See, e.g., Drobnicki ex rel. Drobnicki v. Poway Unified Sch. Dist.*, No. 08–56129, 2009 WL 4912163 at *1 (9th Cir. Nov. 17, 2009); *M.L. v.*

*Federal Way*, 394 F.3d at 636–37; *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 884 (9th Cir.2001). As the district points out, all of these cases involve students who were eventually deemed eligible for special education services under the IDEA.

32. 496 F.3d 932, 942 (9th Cir.2007).

33. 129 S.Ct. at 2484.

34. *Id.* at 2496 (quoting *Florence County Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)) (emphasis in original).

35. *Id.* (quoting *Florence County Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)).

36. *R.B.*, 496 F.3d at 942 (internal quotation marks omitted) (emphasis added).

special education services) required compensatory relief because "[a free appropriate public education], surely, is an education provided by qualified personnel." [37] But notwithstanding this language, the child in each of these cases was determined to be eligible for special education services, unlike P.P., and *R.B.* suggests that eligibility for services is a necessary condition for reimbursement under the IDEA.[38] Here, because there is no appeal of the school district's determination that P.P. was ineligible for special education services due to his ability to access the curriculum, we conclude that any procedural delays caused by the district up to the point of its testing did not deny P.P. a free appropriate public education. Because the district's procedural violation did not give rise to a remedy under the IDEA, P.P.'s parents enrolled him in private tutoring "at their own financial risk," [39] and the law does not require the district to reimburse them for the cost of tutoring.

### D. The Superior Court Correctly Awarded Reimbursement Of Private Evaluation Costs.

The school district argues that P.P.'s ineligibility for special education *services* also precludes him from receiving reimbursement for the cost of the private eligibility *assessment.* But we agree with the superior court's decision, which upheld the hearing officer's order awarding the cost of the eligibility assessment under the circumstances of this case.

The superior court observed that if the school district had met its statutory obligation to evaluate P.P. within 45 school days, it would have been obligated to pay the entire cost of P.P.'s eligibility assessment. In addition, P.P.'s parents would have been entitled to request an independent evaluation at the district's expense if they disagreed with the district's assessment.[40] The district does not dispute these requirements, but argues that the recourse available when a school district fails to timely assess a child for eligibility does not include the cost of a private assessment.

### 1. P.P. was eligible for evaluation at school district expense under IDEA's "child find" requirement.

■ The IDEA's "child find" duty requires that all children with disabilities be "identified, located, and evaluated...." [41] When a school district receives a request that a child be evaluated for eligibility to receive special education services, and the district also receives parental consent to perform such an evaluation, the school district must conduct the necessary testing—and, if the child is eligible, provide special education services—within 45 school days.[42] Because an evaluation is necessary to determine whether a child is "disabled" within the meaning of the IDEA, disability cannot logically be considered a prerequisite for the rights implied by the IDEA's "child find" requirement. Indeed, the Ninth Circuit has held that "child find" is an "independent duty," [43] under which a school district is "legally obligated to procure its own report from a specialist." [44] We conclude that a school district's duty to evaluate children for eligibility under the IDEA is not dependent upon the ultimate determination that the child is "disabled." This is consistent with the language of the IDEA, which requires

**37.** *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.,* 356 F.3d 798, 803 (7th Cir.2004).

**38.** *See supra* note 30.

**39.** *Forest Grove,* 129 S.Ct. at 2496 (quoting *Florence County Dist. Four v. Carter,* 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)).

**40.** In 4 AAC 52.120 Alaska adopted by reference the provisions of 34 C.F.R. § 300.502 (2006), which provides parents the right to an independent evaluation of their child at public expense "if the parent disagrees with an evaluation obtained by the public agency," subject to conditions and procedural requirements, or if requested by a hearing officer during a hearing on a due process complaint.

**41.** 20 U.S.C. § 1412(a)(3) (2006).

**42.** 4 AAC 52.115.

**43.** *JG v. Douglas Cnty. Sch. Dist.,* 552 F.3d 786, 794 (9th Cir.2008).

**44.** *Union Sch. Dist. v. B. Smith,* 15 F.3d 1519, 1523 (9th Cir.1994).

states to fulfill the "child find" obligation in order to receive federal funding.[45] This duty to assess children for eligibility is independent from the separate and more general requirement that states must establish policies to assure that children with disabilities receive free appropriate public education.[46]

The school district does not dispute that it was obligated to evaluate P.P. upon his parents' request and consent for evaluation. The district also concedes that P.P. had *some* right to recourse, in the form of a due process hearing or administrative appeal, in response to its delay. But the district argues that it is not obligated to reimburse J.P. and L.P. for the cost of the private eligibility assessment they arranged for their son.

## 2. Reimbursement of private evaluation costs is appropriate based on the school district's delay, its use of the parents' private eligibility assessment, and the inadequacy of alternative remedies.

█ The school district argues that since P.P. was ultimately deemed *in* eligible for special education services, he was not denied a free appropriate public education and his parents are not entitled to reimbursement for the private eligibility assessment. Under the circumstances of this case, we disagree.

The United States Supreme Court noted in *Forest Grove*, "An order awarding reimbursement of private-education costs when a school district fails to provide a [free appropriate public education] merely requires the district to belatedly pay expenses that it should have paid all along."[47] We agree with the superior court in this case that, under *Forest Grove* and the language of the IDEA, reimbursement of the cost of education *services* is appropriate only where a

child has been found eligible for special education services. But children in the Anchorage School District are entitled to be *evaluated* for services if an evaluation is properly requested on their behalf; the IDEA does not condition the entitlement to this screening upon the outcome of the screening. And school districts are mandated to provide these evaluations in a timely manner.[48] It is neither unreasonable nor surprising that concerned parents who do not receive an eligibility assessment within the 45 school day period allowed under the IDEA will seek to obtain private eligibility assessments for their children, if they can afford to do so. The school district acknowledges this, but argues that when a district fails to act upon a request for an evaluation in a timely manner, the IDEA limits parents' recourse to: (1) requesting a due process hearing; or (2) pursuing an administrative complaint with the Department of Education to obtain an order directing the district to conduct an evaluation.

There are several problems with the district's interpretation of the statute. The first is apparent from the facts of this case: the school district delayed evaluation and then, after parents resorted to private testing, used the results of that testing to satisfy its own eligibility assessment obligation. The district thus eliminated the need for at least some of the testing that the district would otherwise have been required to perform. Dr. Fuller administered nine separate tests of P.P., producing an 11–page evaluation summary and over 150 pages of testing materials and detailed results. The district's Evaluation Summary and Eligibility Report relied exclusively on the results of Dr. Fuller's Wechsler Intelligence Scale for Children for its cognitive assessment of P.P.[49] One of

---

**45.** 20 U.S.C. § 1412 (2006).

**46.** *Compare* 20 U.S.C. § 1412(a)(3) (2006) *with* 20 U.S.C. § 1412(a)(1)(A) (2006).

**47.** *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 129 S.Ct. 2484, 2495, 174 L.Ed.2d 168 (2009) (internal quotation marks omitted).

**48.** 20 U.S.C. § 1414(a)(1)(C)(i) (2006); 4 AAC 52.115.

**49.** The Turnagain Elementary psychologist in charge of cognitive assessments stated in her testimony about compiling the school district's evaluation: "I ... just transfer[red] the information from [Dr.] Fuller's report to our report." In other words, the psychologist would normally be responsible for conducting the cognitive assessment portion of an evaluation, but because Dr. Fuller had already administered the necessary tests for P.P., the psychologist instead simply adopted Dr. Fuller's results and added them to the report.

the three behavior/social/emotional assessments contained in the district's report was based on testing administered by Dr. Fuller, and one of the district's three educational assessments—the Woodcock–Johnson III achievement test [50] was based entirely on Dr. Fuller's test results.[51]

We do not question the school district's decision to use Dr. Fuller's results in its evaluation; there appear to be valid reasons to avoid repeatedly giving the same test to a student within a short period of time.[52] But this does not change the fact that, by delaying its evaluation and relying on the private evaluation paid for by L.P. and J.P., the district partially avoided the cost of completing its statutorily mandated assessment of P.P.'s eligibility for services and entirely avoided the cost of the independent assessment his parents would have been entitled to request in response to the district's assessment. Under these unique circumstances, reimbursement "merely requires the district to belatedly pay expenses that it should have paid all along" [53] and is necessary to hold the school district to its "child find" obligations under the IDEA. Nothing prevents the district from conducting additional testing if the parent's choice of evaluators is unacceptable to the district, and our ruling only requires the district to pay for the reasonable assessment it is statutorily required to perform.

Moreover, we observe that, despite conceding that P.P. had a right to be evaluated for eligibility and that he was entitled to some form of recourse as a result of the district's delay, the school district failed to identify any satisfactory alternative remedies for P.P. and his parents under the facts of this case. The district argues that P.P. could have filed for a due process hearing or pursued a complaint procedure through the Department of Education. But J.P. and L.P. requested an evaluation of their child in May of his first grade year, and were told to wait until the fall. Before their son started second grade, J.P. and L.P. gave the district a written request to evaluate their child. They also met with his principal and teacher, and waited 45 school days. When they received no response, J.P. and L.P. requested a due process hearing to protest the district's failure to act, repeated their request for an evaluation, and only then made arrangements to obtain a private evaluation. The school district did not complete its eligibility assessment until January of 2008, approximately three months after the expiration of the 45 school-day period.

In addition, the district acknowledged at oral argument before our court that parents are intended to receive information about the Department of Education complaint process in the Notice of Procedural Safeguards. Here, the district failed to provide L.P. and J.P. with the Notice of Procedural Safeguards, in violation of 4 AAC 52.480. The school district should not be permitted to rely on its own procedural error to claim that L.P. and J.P. did not seek all available remedies and that they are precluded from reimbursement as a result.

## V. CONCLUSION

We AFFIRM the superior court's decision denying the cost of private tutoring, and AFFIRM its award of the cost of the private eligibility assessment.

FABE, Justice, not participating.

---

**50.** The Woodcock–Johnson III achievement test was the only one of the three educational assessments to test both language and math skills.

**51.** The other categories in the Evaluation Summary and Eligibility Report are: Parent Information, Developmental/Medical History, Communication (e.g., pronunciation), Hearing, Vision, and Classroom Observation.

**52.** Both Dr. Fuller and the Turnagain Elementary psychologist, Olga Kyselova, noted that some tests require six months between administrations to avoid a "practice effect" that could invalidate the results.

**53.** *Forest Grove,* 129 S.Ct. at 2495.